Lulu E. Morrow v. Missouri Gas & Electric Service Company, Appellant.

Division One, July 30, 1926.

1. **PLEADING: Cause of Action: Oral Objection to all Evidence.** Defendant does not waive the right to challenge the sufficiency of the petition to state a cause of action at any stage of the proceeding, but if he files no written demurrer, and waits to object thereto until the outset of the trial and then objects to the introduction of evidence on the sole ground that it does not state sufficient grounds to constitute a cause of action, the court, because of the untimeliness of the attack, will accord to the allegations every reasonable inference and intendment arising from a liberal construction, and will sustain the objection only when the petition wholly fails to state a cause of action.

2. ————: ————: **Electricity: Excessive Quantity.** A petition alleging that a movable insulated drop cord, at the end of which was attached an ordinary light bulb, had been installed in the basement of the dwelling house, and that "at the time said Morrow so took hold of said drop cord, defendant and its servants had carelessly and negligently caused or permitted said cord to become and be charged with electric current in such excessive quantities and of such high voltage as to be dangerous to any one touching said drop cord, and by reason thereof the said Morrow, when he touched said cord, received an electric shock and was thereby killed," does not wholly fail to state a cause of action, and is impervious to the oral objection, made at the outset of the trial, to the introduction of any evidence. The word "excessive" implies electricity exceeding a proper or reasonable limit.

3. **NEGLIGENCE: Excessive Current of Electricity: Failure of Proof.** Substantial evidence that deceased was a customer of defendant, which supplied his residence with electrical current for ordinary domestic uses; that in the basement was installed a movable insulated drop cord, attached to the ceiling by a socket, and that at the end of the cord was an ordinary light bulb; that he went at ten o'clock at night to the basement to take a bath, and the next morning his body, rigid and stiff, was lying on the wet concrete floor; that the electric cord had been burned in two and part of it was lying beside the body; that burns were on the right hand and wrist, the reasonable and natural explanation of which is that they could only have been caused by contact with the electric drop cord; that the cord had been handled with safety by both deceased and his wife for a period of two years; that the usual and normal current delivered through the cord was approximately 110 volts; that such voltage is not ordinarily dangerous to a normal, healthy man, such as deceased was; that a current of 500 volts is dangerous to human life; that neighbors, served by the same secondary wires or circuit, received shocks when handling electrical appliances in their houses on the same night; that early next morning defendant's manager noticed a 2300-volt primary wire and one of the secondary wires which supplied deceased's dwelling in contact with a limb of a live or green tree; that defendant's lineman saw burns on this limb on the same morning; that sparks were seen to fly from this tree two weeks before the casualty; that experts were of the opinion that the 2300 voltage of the primary wire, in contact with a green limb, could be carried by the green limb to the secondary wire, also in contact with it, and thence into deceased's residence and through the body of deceased, and that the resistance to electrical energy of the human body is less than that of a growing tree trunk, is sufficient

to support a verdict for plaintiff, and is proof that an excessive current of electricity was on the drop cord at the time of deceased's death, and is not so vague and uncertain as to be classed as speculation, nor can the verdict be said to be the result of building inference upon inference and presumption upon presumption.

4. CONTRADICTORY EVIDENCE: Question for Jury. Where the evidence for plaintiff is sufficiently substantial, if true, to support a verdict for him, and the evidence for defendant, if true, is sufficient to relieve defendant from all liability, it is the province of the jury to say which theory is true. Neither court nor jury is bound to accept as final and conclusive defendant's showing of the perfection of its electrical appliances or its scrupulous care and caution in their installation and operation, if the proved circumstances will justify reasonable men in finding otherwise.

5. ELECTRICITY: Expert Knowledge. Electricity is a deadly force, but invisible, and so insidious and knowledge of it so limited that courts and juries must rely upon experts in electrical science for information pertaining to the conditions which mean life or death to those who come in contact with it.

6. NEGLIGENCE: Number of Causes; Conjecture. To sustain a verdict for plaintiff it is sufficient if, from all the circumstances present and testified to by the witnesses, there is a preponderance of evidence to convince the jury that deceased came in contact with an electric wire and in doing so received a shock which caused his death; and where there is no other cause shown in the evidence which might have produced the existing conditions, it will not be ruled that his death could have occurred from a number of causes and the verdict is based upon mere conjecture as to which of them was the proximate cause.

7. ———: Electrically Charged Limb: Removal without Injury. The primary wire and the secondary wire being in touch with the same limb of a green tree and there being a number of burns upon the limb, and experts being of the opinion that an excessive current of electricity could thereby be carried from the primary wire to the secondary wire which entered the residence of deceased, it cannot be ruled that, merely because persons who afterwards removed the limb received no electric shock while removing it, the verdict for plaintiff was contrary to the physical facts, where the working conditions at the time of the removal were wholly different.

8. INSTRUCTION: Electric Wire: Private Installation. The instruction in this case, in which it was admitted that the insulated wire which entered deceased's residence was not installed or maintained by defendant, but it is alleged that such wire was caused or permitted to be charged with an excessive quantity of electricity from defendant's primary wire which came in contact with such secondary wire in a green tree through which both were strung, did not assume that said extension wire inside the residence was a part of defendant's distributing system, but if it was not clear on that point the defect was cured by defendant's given instruction which told the jury that "defendant was not responsible for any defect in the wiring within the house of deceased."

9. ———: General and Specific Negligence. An instruction which follows the specific allegations of the petition submits specific, and not general, negligence; and if in submitting the specific negligence it presents certain evidentiary facts which go to establish it, and submits the acts of negligence conjunctively and requires the jury to find the existence of both, it places an additional burden upon plaintiff of which defendant cannot complain.

10. ———: Broadening Issue. Where the petition charged that the defendant caused or permitted the insulated drop cord inside the residence to become and be charged with electric current "in excessive quantities," an

instruction which required the jury to find that the current was "in excess of the usual and ordinary voltage" did not broaden the issue.

11. ———: **Electricity: Excessive Amount: Wires in Contact in Tree.** Positive evidence that defendant's high-voltage wire and the secondary wire which entered deceased's house were touching the same limb of a green tree shortly before deceased made use of the drop cord of the secondary wire, is sufficient proof to support an instruction submitting the issue that there was an excessive current or voltage on the drop wire at the time of the casualty.

12. ———: **Omitting Defense.** Instructions for plaintiff omitting the defenses urged are not erroneous, where those given for defendant fairly and fully cover every defense raised by the evidence.

13. ———: **Measure of Damages: Life Expectancy: Health and Vocation.** In an action by a wife for the pecuniary loss sustained by the negligent killing of her husband, an instruction which predicates her damages on his shorter life expectancy alone is not erroneous. Neither is it erroneous for that it omits any reference to her health, vocation or habits, where she appears as a witness before the jury.

14. ———: **Expert Testimony.** An instruction telling the jury that "the testimony given by the expert witnesses is to be taken and considered by the jury like the evidence of other witnesses who testified in the case" is not erroneous.

15. **EVIDENCE: Excessive Electricity: Other Neighborhood Shocks.** In the trial of allegations that defendant caused or permitted excessive quantities of electricity to pass over an insulated drop cord in the residence of deceased, testimony of neighbors that they had shortly previously received electrical shocks from similar wires in their homes, and that sparkling was seen from wires in trees through which passed the wires serving the home of deceased, is competent evidence.

16. ———: **Outside of Issues: Misfeasance and Non-feasance.** Where the petition charges that defendant negligently caused or permitted an insulated drop cord in deceased's house to become and be charged with electric current in excessive quantities and of such high voltage as to be dangerous, any act or omission of defendant, whether it be a failure to use a ground wire or otherwise, tending to show that an excessive current of high voltage was caused or permitted to enter the drop cord, is properly admissible, and therefore evidence tending to show that defendant did not use a safety device, known as a ground wire, was not outside of the issue tendered. Such evidence could not be excluded on the theory that the allegations charged misfeasance, but not non-feasance or failure to provide a safety device.

Corpus Juris-Cyc References: **Appeal and Error,** 3 C. J., Section 708, p. 786, n. 76; p. 787, n. 77; 4 C. J., Section 2589, p. 690, n. 84; Section 2591, p. 691, n. 86; Section 2677, p. 745, n. 71, 72; Section 2890, p. 918, n. 42; p. 919, n. 44. **Damages,** 17 C. J., Section 362, p. 1061, n. 80. **Electricity,** 20 C. J., Section 47, p. 363, n. 69; Section 57, p. 377, n. 77; Section 59, p. 378, n. 88; Section 61, p. 379, n. 4; Section 65, p. 384, n. 39; Section 66, p. 388, n. 58; p. 389, n. 67; Section 67, p. 390, n. 75; Section 69, p. 395, n. 99; p. 396, n. 4. **Evidence,** 22 C. J., Section 747, p. 653, n. 38; Section 825, p. 736, n. 41; Section 872, p. 769, n. 64. **Excessive,** 23 C. J., p. 181, n. 20, 21, 22. **Negligence,** 29 Cyc., p. 621, n. 92. **Pleading,** 31 Cyc., p. 82, n. 13; p. 759, n. 93; p. 761, n. 3. **Trial,** 38 Cyc., p. 1615, n. 20; p. 1728, n. 45; p. 1778, n. 72, 73; p. 1779, n. 74, 75; p. 1784, n. 86.

Appeal from Clay Circuit Court.—*Hon. Ralph Hughes,* Judge.

AFFIRMED.

315 Mo.—24.

*John H. Lucas, William C. Lucas, A. F. Wherritt* and *Ludwick Graves* for appellant.

(1) The trial court erred in refusing to sustain the objection to the introduction of any testimony. The petition did not state facts sufficient to constitute a cause of action. Brown v. Mobile Electric Co., 207 Ala. 61, 91 So. 802. (2) The trial court erred in refusing to grant the demurrer to the evidence and the peremptory instruction, for under the pleadings and the evidence there was no actionable negligence against the appellant. (a) The evidence of the respondent is so vague, uncertain and speculative that it does not constitute actionable negligence against appellant; there is no actual proof that any excessive current was on the drop cord in the basement of Dr. Morrow's home the night he met his death. State ex rel. Mo. Pub. Util. Co. v. Cox, 298 Mo. 427; Hamilton v. Ry. Co., 250 Mo. 714; Hays v. Hogan, 273 Mo. 1, 25. To hold liability in this case runs counter to the rule that inference cannot be piled upon inference nor presumption upon presumption to establish a fact necessary to be proven. State ex rel. Mo. Pub. Util. Co. v. Cox, 298 "¯). 432; Hamilton v. Railroad, 250 Mo. 722; Swearingen v. Railroad, 221 Mo. 659; Yarnell v. Railroad, 113 Mo. 580. (b) Where the evidence of plaintiff's claim is so vague and unsatisfactory the court in considering a demurrer to the evidence may also consider the evidence of the defendant. Flack v. Santa Fe Ry. Co., 285 Mo. 48; Jackson v. Hardin, 83 Mo. 185; Furber v. Bolt & Nut Co., 185 Mo. 301; Turner v. Anderson, 260 Mo. 29; Huffnagle v. Pauley, 219 S. W. 379. (c) Under all of the evidence there is no proof of any excessive current, but to the contrary that no excessive current entered the Morrow home on the night of August 23, 1921. Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257; Smith's Admr. v. Middlesboro Electric Co., 164 Ky. 46, 174 S. W. 773; Harter v. Colfax Electric Co., 124 Iowa, 500; Kuhlman v. Water, Light & Transit Co., 271 S. W. 797. (d) Where the accident, as in this case, could have occurred from a number of causes, only one of which the defendant could have been liable for, then the plaintiff must show with reasonable certainty that the cause for which the defendant is liable produced the result, and if the evidence leaves it to conjecture, as is the fact in the case at bar, the plaintiff must fail in the action. Warner v. Railroad, 178 Mo. 125; Coin v. Lounge Co., 222 Mo. 488; Graefe v. Transit Co., 224 Mo. 232; State v. Goodson, 299 Mo. 321. The appellant could not have been liable for the normal 110 volt current escaping through Dr. Morrow's own wiring, causing a shock, fall and fracture of the skull from which he might have died. 1 Joyce's Electric Law (2 Ed.) p. 740, par. 445; Minneapolis G. E. Co. v. Cronon, 166 Fed. 661; Kuhlman v. Water, Light & Transit Co., 271 S. W. 796. (e) The theory of the case submitted by the respondent

is against the physical facts. Waldmann v. Skrainka Con. Co., 233 S. W. 247. (3) The trial court erred in admitting incompetent, irrelevant and immaterial evidence on the part of the respondent. (a) In admitting evidence of slight shocks of four witnesses received off of isolated fixtures in their homes, said evidence being without the issues, incompetent, speculative and having no tendency to prove the issues between the parties. (b) In admitting evidence that appellant did not have a safety device known as a ground wire on the circuit feeding the Morrow home, the same being entirely without the issues. (c) In admitting the limbs of a tree with burned places on it, there being no evidence as to when the burns occurred; it was remote, speculative, unconnected and of no probative force. (d) In admitting testimony of the sparkling of wires in a tree; said testimony being speculative, unconnected, remote and did not tend to prove any issues between the parties.

*James S. Simrall* and *Lawson & Hale* for respondent.

(1) The petition clearly states facts constituting a cause of action, and the trial court did not err in overruling respondent's objection to the introduction of any testimony thereunder. Haseltine v. Smith, 154 Mo. 404; Goldsmith v. Candy Co., 85 Mo. App. 595; Heckfuss v. American Packing Co., 224 S. W. 99; White v. Railroad, 202 Mo. 539; Lafever v. Pryor, 218 S. W. 970; Thompson v. Lyons, 220 S. W. 942. (2) Under the pleadings and evidence plaintiff was entitled to submit her case to the jury on the question of defendant's negligence; and the trial court properly overruled defendant's demurer to the evidence. Solomon v. Moberly L. & P. Co., 303 Mo. 622; Lynch v. Meyersdale Power Co., 112 Atl. 58; Texas Power Co. v. Bristow, 213 S. W. 702; Secherman v. Wilkesbarre Co., 255 Pa. 11; Alabama Co. v. Appleton, 171 Ala. 324; Vessels v. K. C. Light & Power Co., 219 S. W. 80; Coleman v. Iowa Power Co., 178 N. W. 365; Washington Ry. Co. v. Dalaney, 288 Fed. 421; Welsch v. Light & Power Co., 193 N. W. 427; Haas v. Power Co., 93 Wash. 291; Power Co. v. Requena, 224 U. S. 89. (3) The trial court did not admit incompetent, irrelevant and immaterial evidence on the part of respondent. (a) Evidence of shocks received by neighbors of deceased, shortly prior to his death, and from the same secondary circuit supplying his home, was relevant and material testimony, and was clearly within the issues in the case. Texas P. & L. Co. v. Bristow, 213 S. W. 702; Adams v. United Co., 69 Pa. Super. Ct. 478; Lynch v. Meyersdale Co. (Pa.), 112 Atl. 58; Ohrstrom v. Tacoma, 57 Wash. 121, 106 Pac. 629; Light Co. v. Requena, 224 U. S. 89, 56 L. Ed. 680; Solomon v. Moberly L. & P. Co., 303 Mo. 622. (b) Evidence that defendant had no ground wire on the secondary circuit supplying deceased's home was relevant and material to the

issues between the parties. (c) Plaintiff's Exhibit 12, which was the burned limb of a tree and which when removed from the tree was in contact with defendant's transmission lines in the immediate vicinity of deceased's home, was properly admitted in evidence. (d) Evidence of the sparkling of wires in trees was material and relevant to the issues, and was properly admitted. Kelly v. Higginsville, 185 Mo. App. 55; Solomon v. Moberly L. & P. Co., 303 Mo. 622.

SEDDON, C.—Action by plaintiff (respondent) to recover damages for the death of her husband, Allen E. Morrow, because of the alleged negligence of defendant (appellant). The petition was filed on September 23, 1921, and alleges, in substance, that deceased met death on August 23, 1921; that he was survived by his widow and a minor son about two years of age, and that the suit is instituted within six months after deceased's death; that defendant was, at the time mentioned, engaged in furnishing and selling to consumers within the city of Liberty, Missouri, electricity for domestic and commercial uses, and maintained and operated a distributing system within said city, consisting of wires, poles and other equipment, for the purpose of transmitting electric current to and into private residences within said city for lighting and cooking purposes, and sold such electricity to such consumers for such purposes; that on August 23, 1921, and prior thereto, deceased was a consumer of electricity furnished by defendant through its said distributing system and said deceased used such electricity in his residence, located at the corner of Kansas and Lightburne Streets in said city, for lighting and cooking purposes; that, as a part of the lighting system of said residence, there had been installed in the basement a socket in the ceiling thereof, to which was attached an insulated drop cord, at the end of which was attached an ordinary light bulb; that electric current flowed from defendant's house-service wires on said Kansas Street through wires strung over the land on which deceased's residence was located and through the same into the electric wiring in said residence, and thereby electric current was brought into the wires inside of said residence, including the wires to which said drop cord and light bulb in the basement of said residence were attached at said socket; "that the said Allen E. Morrow, on the night of the 23rd day of August, 1921, whilst in the exercise of ordinary care and caution for his own safety and without negligence on his part, took hold of said drop cord in the basement of his residence, with the fingers of his right hand, for the purpose of moving the same from one place in said basement to another; that, at the time said Morrow so took hold of said drop cord, defendant and its servants and agents had carelessly and negligently caused or permitted said drop cord to become and be charged with electric current in such excessive quantities and of such high voltage as to

be dangerous to anyone touching, or in any manner coming into contact with such drop cord, and by reason thereof, the said Allen E. Morrow, when he touched said drop cord, received an electric shock and thereby suffered death as a result thereof.''

The answer is a general denial.

Deceased's residence was a one-story bungalow, with basement, at the southeast corner of the intersection of Kansas and Lightburne Streets in the city of Liberty. In the southeast corner of the basement was a shower bath, which had been used by deceased and his wife for a period of about two years. In another corner of the basement was a coal bin. Suspended from a plug or socket in the ceiling near the coal bin was an extension or drop cord with a light bulb, or lamp, on the end thereof. When using the shower bath, it appears to have been the custom of deceased and his wife to move the lamp and hang the extension cord over a nail inside the door of the coal bin, "so there would not be so much light in the basement." The extension cord was attached to the ceiling by a separable plug or socket, which pulled apart. Near the middle of the basement were two wooden supports, or columns, a few feet apart, in a north and south line, to one of which supports were fastened two water faucets.

Deceased and his family had been on a trip of several weeks to the State of Washington and had rented their residence during their absence to a family named Hunt. Deceased had returned to Liberty a few days before his death, leaving his wife and son in Washington, and was occupying one of the bed rooms in his residence, the Hunt family occupying the other rooms. On the night of August 23, 1921, deceased had attended a lodge meeting, arriving home about ten o'clock in the evening. He asked Mrs. Hunt, or her daughter, if he might take the electric fan back to his bed room, saying that he was going down into the basement to take a shower bath, and went on back to his room. He was heard to turn off the light in his bed room and go down into the basement. Shortly afterward, Mrs. Lewis, daughter of Mrs. Hunt, heard a noise which startled her, and which, as she expressed it, "was sort of a 'ugh,' like that (indicating)." Next morning, Mrs. Hunt and her daughter were awakened about 5:30 o'clock by the ringing of an alarm clock in deceased's room. After waiting a few minutes and not hearing deceased, they looked into his bed room and discovered that the bed had not been slept in and that the inside basement door was open. They summoned several neighbors, who found the lifeless body of deceased, stiff and rigid, lying on the concrete floor of the basement immediately east of, and parallel with, a sanitary couch, which was set between the two wooden supports or columns. Deceased's body was lying flat on the back, the legs extended, the arms folded across

the chest, with the feet to the north and the head to the south. The thumb and index finger of deceased's right hand were burned to the bone, there were several small burns on the right wrist, and the skull was fractured on the left side about half way between the ear and the median line, or the middle of the back of the head. Blood had been flowing from the left ear. The coroner testified that the fracture of the skull was sufficient, independent of other causes, to have caused death. There was evidence that one of the water faucets on the wooden support near the feet of deceased had been dripping, and there was a damp spot on the concrete floor, the edge of which was near the feet of deceased. Deceased's body was naked and his night gown was lying over his feet. The extension cord suspended from the ceiling was burned in two about six or eight inches from the end of the lamp or light bulb, and the shorter part with the lamp attached was found upon the basement floor near the body of deceased. Neither the electric light bulb, nor the glass standard through the middle of the bulb, was broken, and the bulb was not discolored, but the filament within the lamp globe was broken. The remainder, or longer portion, of the extension cord was still attached to the plug or socket in the ceiling and was hanging down with the burned end thereof resting upon the concrete floor. Witnesses saw no sparkling or sputtering from the end of the extension cord on the concrete floor, nor were there any burned places upon the floor where the end of the extension cord touched the floor.

The electrical current distributed by defendant is a sixty cycle alternating current. The electrical energy or current is brought from Kansas City to defendant's substation in Liberty on wires carrying 33,000 volts and reduced at the substation through transformers to 2300 volts, from whence it is transmitted on (so-called) primary wires throughout the city of Liberty to other transformers, some fifty in number, where the current or electrical energy is further reduced from 2300 volts to approximately 110 volts and then carried over secondary or house-service wires to the residences of consumers. One of the latter transformers, connecting the primary with the secondary wires, was located on a pole at the northeast corner of Kansas and Lightburne Streets, directly across the street from deceased's residence; from this transformer, both primary and secondary wires extended eastwardly to the Christian Church on an alley, about a half-block distant, and south on the alley to Mill Street and east on the south side of Mill Street about three or four houses, and also extended northwardly and westerly from the Morrow residence, serving in all some seventeen different residences in addition to the Christian Church. The primary and secondary wires were strung on the same poles. The poles were about twenty feet in height, and the two primary wires, carrying 2300 volts, were

placed on horizontal cross-arms near the tops of the poles. About twenty-six inches below the two primary wires were the two secondary or house-service wires, normally carrying 110 volts, and these two secondary wires were also strung on cross-arms attached to the poles, almost directly under the primary wires. The first pole east of the transformer is distant about 125 feet, and from that pole the secondary or house-service wires extended southwesterly to a connection with the house wiring under the eaves of deceased's residence. There was also a street-lighting circuit or wire extending down the alley on the west side of the Christian Church to Mill Street, near the Morrow residence, carrying approximately 1200 volts. This street-lighting circuit was strung upon the same poles which carried the primary and secondary wires of defendant's distributing system. At the time in question, no one other than defendant was furnishing electricity of high power in the city of Liberty. The evidence tended to show that the wiring in deceased's residence was installed by the property owner himself, with which wiring defendant had nothing to do, the service wires of defendant leading to the outside of the house and being there connected with the house wiring.

Shortly after the body of deceased was found on the morning of August 24, 1921, the manager of defendant, accompanied by a lineman, took a volt meter to the residence of deceased and made a test of the voltage between the two secondary wires in the basement of the house, which test showed a difference in potential between the two secondary wires of approximately 115 or 116 volts, but no test was made of the difference in potential between either secondary wire and the ground. This test was made about 6:30 o'clock in the morning, after the street-lighting, or arc, circuit had been turned off. The volt meter was subsequently tested in the laboratory of the Kansas City Power & Light Company with a standard volt meter and found to be 1.37 per cent low, or normal. The transformer through which the current passed to the Morrow home was taken down and tested, first by defendant's manager, and afterward in the testing laboratory of the engineering school of the State University, and found to be in good condition. The undisputed testimony was to the effect that, if the transformer had broken down because of a high or excessive voltage of electricity, it would have remained in that condition until rebuilt.

Plaintiff's evidence tended to show that, shortly after dark on the evening of deceased's death, the witness, Rev. D. F. Cuthbertson, whose home was on the alley extending from the Christian Church south to Mill Street and about a block and a half distant from the Morrow home, saw ''a blaze flying up about every few minutes about a foot high'' in a tree located on the alley, through which defendant's

primary and secondary circuits and the street-lighting circuit passed; that this blaze "would just flash up every few minutes, then drop down and go out, and come up again." On the morning after deceased's death, defendant's manager examined the wires passing through this tree and noticed that the street-lighting wire and one of the secondary wires were touching the limbs of the same tree, and that these wires were about five or six feet apart; he also testified that the secondary wire was on the same circuit as deceased's residence. Defendant's manager further testified that he also looked at a tree about twenty-five feet east of the transformer and pole on the north side of Kansas Street, across the street from the Morrow home, "in a casual way," and "saw the primary wires and secondaries both touching a good many limbs." Defendant's lineman, Allen, when asked if he noticed a burned place on the side of the limb of the last-mentioned tree on the morning following the casualty, answered: "I noticed a number of burns. You find them all over town." The evidence tended to show that no changes in the relative position and location of defendant's wires had been made by defendant since deceased's death, and that the only change in the trees was that due to normal growth, except the removal of a limb of the tree across the street from deceased's residence, which removal occurred about the middle of December, 1921, some four months after the casualty.

About the middle of December, 1921, plaintiff caused a limb, about five and one-half inches in diameter and about seven feet long, to be removed from the tree directly across the street from the Morrow home, which limb was introduced in evidence by plaintiff. Upon this limb are two burns or abrasions. At the time of the removal of the limb, one of the 2300-volt primary wires was resting within a quarter of an inch of the upper burn or abrasion, which is some thirteen inches long, five and one-half inches in width and two and one-half inches in depth at its deepest point. The lower burn or abrasion is about twenty-two inches below and distant from the upper burn, and is two inches in length, four inches wide and one inch deep. Imbedded or fastened in the lower burn, at the time of the removal of the limb, was one of the secondary or house-service wires, leading directly to the Morrow home, which the witnesses pulled loose with a garden rake. The limb was a live or green limb at the time of its removal. The testimony of plaintiff's witness Johnson was that, some two weeks before deceased's death, in passing this tree on his way to and from work, he noticed "under the wires there, right by the wires, sparks flying several times."

Plaintiff introduced the testimony of several witnesses, whose homes were in the vicinity of the Morrow home and were served by the same secondary wires or circuit, that, on the evening of August

23, 1921, or shortly before that date, they received shocks in using the electrical switches and other appliances within their respective homes. Mrs. Lewis, who was temporarily residing with her mother in the Morrow home in which deceased met his death, testified that a few days before deceased's death she received electrical shocks in the house while turning off the light in the front bed room, and while attaching the iron to the electric stove in the kitchen, and, on the morning of deceased's death, she received a shock while attaching a curling iron to the stove. Another witness, Mrs. Hanna, testified that, about eight o'clock on the night of deceased's death, she started to detach an ironing cord from a socket in the basement of her home, a block north of deceased's residence, and was severely shocked. Rev. D. F. Cuthbertson testified that his wife received a shock in his home on the night of deceased's death and "when she touched the bulb, the sparks would fly off onto the floor." Some six or eight witnesses in all testified to having received similar shocks on, or shortly prior to, the evening of deceased's death.

Plaintiff produced testimony of expert witnesses to the effect that electricity, or an electrical current, will pass from a primary wire in contact with the green limb of a tree to a secondary wire in contact with the same limb twenty-two to twenty-four inches from the primary wire; that "the two circuits will come to the same potential, same voltage, which will be slightly lower than the 2300 voltage on the primary;" that a floating or swinging electrical contact is one which is only temporary, such as will be caused by a limb and wire swinging into momentary contact, and "during the time of contact, there would be a flow of current in an alternating current;" that the sap or moisture in a live tree gives it carrying capacity as a conductor of electricity; that the resistance of a man's body is less than the resistance of a live tree and more voltage will pass through the human body than through the tree in seeking the ground; that a man, standing in his bare feet on a damp concrete floor and taking hold of a drop cord connected with the secondary wires, will receive the current or voltage through his body; that an electrical current of 110 volts, even from a bare wire, is not considered a dangerous current, and may be handled without serious injury to a man in normal or healthy condition; that a voltage above 500 is considered a dangerous voltage and that the voltage of about 1200 carried on the street-lighting system is dangerous, and, of course, the 2300-volt current carried on the primary wires of appellant's system is dangerous to human life.

The testimony of defendant's expert witnesses, on the other hand, was to the effect that, if either a primary wire or the wire of the street-lighting circuit came in contact with a limb of a live tree and a secondary wire was also in contact with the limb of the same

tree, both wires will be grounded through the trunk of the tree to the ground and each of the wires will assume or take the ground potential, or zero, and there is then no appreciable voltage between the primary and secondary wires or between either wire and the ground; that it is possible for a man standing on a damp concrete floor in his bare feet to receive a shock of 110 volts sufficient to knock him down and even to cause instant death. Plaintiff's experts, on cross-examination, testified that it is possible that a person susceptible to electrical shocks might be killed by a current of 110 volts, but that ordinarily the conditions of normalcy would prevent his being killed.

Defendant's evidence was that the Morrow residence was equipped with the usual standard meter and fuses used in ninety per cent of the residences upon house-lighting circuits; that these fuses consist of a small alloy or composition wire, connecting the two secondary wires of the circuit, encased in porcelain, and are so constructed that an excessive current of electricity passing through them will melt the alloy wire and thereby break the circuit; that, if an excessive current had gone into deceased's residence over the secondary wires it would have blown out the fuses and burned up the meter and the lamps, or light bulbs, in the house, and would have similarly affected every other instrument in all the houses on the same circuit; that none of the meters, electric light bulbs or fuses of deceased's house, or of any other house on the same circuit, was affected; that no changes were made in the meter, fuses or lamps in the Morrow home after the casualty and they were found to be in good condition. Defendant also produced evidence that its substation in Liberty was equipped with automatic switches and ammeters connected with each circuit, including the street-lighting circuit, throughout the city; that a "short" on any circuit at any point in the city will throw out the automatic switch: that none of the automatic switches was thrown out on the night of August 23-24, 1921; that the ammeters are delicately adjusted instruments intended to show automatically all short circuits on the line, and are read every hour during the day and night and the readings are recorded; that the reading of the ammeters on the night in question showed no electrical disturbance of any kind upon any of the circuits; that the substation was also equipped with a recording volt meter which automatically records the voltage upon a chart attached to the instrument, and, in case of accident or interruption and the voltage drops, the instrument indicates upon the chart in ink the change in voltage and the exact time thereof; that the chart was attached to the instrument on the morning of August 23rd and removed on the morning of August 24, 1921, and showed no record of any interruption or change in voltage on the circuits. Defendant also offered testimony that

its manager and one of its linemen made an inspection of all the circuits in Liberty on the morning following the casualty and found no contact, at any place, between its street lighting or primary circuits and the secondary, or house-service, circuit.

Plaintiff's evidence tends to show that, while the standard fuses used in the Morrow home are rated and tested to withstand a current of 125 to 250 volts and an amperage of from five to thirty amperes before burning out, nevertheless, in case of an excessive current, the melting or burning of the alloy connection is not instantaneous, but requires a time element of approximately a half minute, and a longer time is required to burn out a meter; that, in case of an excessive current passing through a human body serving as a contact between a secondary wire and the ground, the surge of electricity would be almost instantaneous and could or might result in the death of the person serving as a contact without blowing out or injuring the fuses, lamps or meter in the house.

Defendant's experts testified that an excessive current passing through the body of a man standing upon a damp concrete floor in his bare feet will be manifested by burns upon the feet of the man, while, on the other hand, plaintiff's experts testified that, in their opinion, there would be no burn or manifestation of the passage of the current upon the feet, because the bare feet of the man on the damp concrete would make a perfect contact, whereas electrical burns only result from an arc formed as a result of imperfect contact. An examination of deceased's body disclosed no evidence of burns upon the feet. Plaintiff's evidence tended to show that a normal man, in good health, standing in his bare feet on a damp concrete floor and holding an imperfectly insulated drop cord connected with a secondary wire carrying a normal or usual current of 110 volts, would not likely be electrocuted or killed thereby.

Deceased was forty-five years of age at his death, six feet two inches in height, and weighed 207 pounds. He had a life expectancy, according to the American Experience Mortality Table in evidence, of 24.54 years. His health and physical condition were shown to be good. His wife was forty-three years of age at the time of her husband's death and, hence, had a longer life expectancy. Deceased was a veterinarian, having practiced his profession in Liberty for several years before his death, and his income therefrom averaged about $6,500 per year. The trial resulted in an unanimous verdict and judgment for plaintiff for $8,500, from which judgment defendant, after taking the necessary steps therefor, has appealed to this court.

I. At the commencement of the trial, defendant interposed an objection to the introduction of testimony upon the ground that

the petition does not state facts sufficient to constitute actionable negligence upon the part of defendant. Error is assigned **Pleading.** in the denial of this objection by the trial court. It is urged that the petition is defective in that it does not specifically aver that the current of electricity reasonably necessary for the lights and other electrical appliances in the Morrow residence was not dangerous to human life. Appellant cites Brown v. Mobile Electric Co., 207 Ala. 61, in support of its contention. In that case, the petition averred that the defendant had agreed to furnish a current of electricity such as was reasonably necessary to run the fans, lights and moving-picture machine in a motion-picture theatre, but negligently furnished a greater current than was reasonably necessary for said purposes. Apparently a demurrer to the foregoing allegation of that petition was timely filed and sustained. It further appears from the allegations of the petition in that case that defendant, by special contract, had agreed to furnish electrical current for an extraordinary purpose, to-wit, the operation of a moving-picture machine, while in the case at bar it is alleged that the current was furnished for residential or domestic uses only. We think that the facts differentiate the cited case from the instant case. Furthermore, the record in the instant case does not indicate that defendant attacked the sufficiency of the petition, either by demurrer or by motion to make more definite and certain, prior to the trial. While it is true that defendant does not waive the right to challenge the sufficiency of the petition to state a cause of action at any stage of the case, nevertheless, courts do not look with favor on the practice of waiting until the trial to challenge the sufficiency of a pleading, and this court, because of the untimeliness of the attack, will view the petition with a benignant eye and accord to its allegations every reasonable inference and intendment arising from a very liberal construction. [Hazeltine v. Smith, 154 Mo. 404; Stonemets v. Head, 248 Mo. 1. c. 251, 252; Parish v. Casner, 282 S. W. 1. c. 408.] Applying a liberal and reasonable construction to the petition herein, we are of the opinion that it states a cause of action. It avers that, "at the time said Morrow so took hold of said drop cord, defendant and its servants and agents had carelessly and negligently caused or permitted said drop cord to become and be charged with electric current in such *excessive* quantities and of such high voltage as to be dangerous to anyone touching" such drop cord. The word "excessive" is defined as "characterized by, or exhibiting, excess; as: exceeding what is usual or proper; overmuch; greater than the usual amount or degree." [Webster's New International Dictionary.] The word "excessive" means tending to or marked by excess, which is the quality or state of exceeding the proper or reasonable limit or measure. [3 Words and Phrases, p. 2544, citing Central of Georgia

Ry. Company v. Johnston, 106 Ga. 130.]   An objection to all evidence will be sustained only when the petition wholly fails to state a cause of action and not where a cause of action is defectively stated [Pattison on Missouri Code Pleading (2 Ed.) p. 832, sec. 1011, and cases there cited.]   A petition couched in almost identical language was held to state a cause of action [Texas Power & Light Company v. Bristow (Texas Civ. App), 213 S. W. 702.]   The assignment must be denied.

II. Appellant assigns error in the refusal of its peremptory instructions in the nature of demurrers  to the evidence, offered at the close of plaintiff's case-in-chief and at the close of the whole case, upon the ground that there was no proof of actionable negligence of defendant.   Appellant insists that the evidence of plaintiff is so vague, uncertain and .speculative as not to rise to the dignity of proof; that there is no actual proof that an excessive current or voltage was on the drop cord in the basement of deceased's residence at the time he met his death; and that the verdict and judgment cannot stand without building inference upon inference and presumption upon presumption, which cannot be done in order to prove or establish defendant's negligence. Without again reviewing the evidence in detail, suffice it to say that we believe the evidence is sufficiently substantial to establish defendant's negligence, or at least to justify the submission of that issue to the jury as one of fact.   There was substantial evidence upon plaintiff's part that her deceased husband was a customer of defendant, which supplied his residence with electrical current for ordinary domestic uses; that deceased was found dead in the basement of his home, bearing upon his right hand and wrist burns, the reasonable and natural explanation of which is that they could only have been caused by contact with the electric drop cord, which had been burned in two and part of which was found lying beside his dead body; that the drop cord had been handled with safety by both deceased and his wife for a period of two years before the casualty; that the usual and normal current and voltage delivered by defendant to deceased's home was approximately 110 volts; that such voltage is not usually or ordinarily dangerous to a normal, healthy person; that deceased was in good health and he was not shown to have been peculiarly susceptible to electrical shocks; that a current in excess of 500 volts is dangerous to human life; that neighbors of deceased, and one member of his own household, all served by the same secondary wires or circuit, received shocks when handling electrical fixtures and appliances within their respective homes on the night of deceased's death, or immediately prior thereto; that, on the morning of the discovery of deceased's body, defendant's manager noticed

**Failure of Proof.**

a 2300-volt primary wire and one of the secondary wires which supplied deceased's residence in contact with a limb or limbs of a live or green tree; that defendant's lineman saw burns upon this limb on the same morning; that sparks were seen to fly from the branches of this same tree some two weeks before the casualty; plaintiff's experts were of the opinion that the 2300 voltage, or slightly less, of the primary wire, in contact with a green limb, could be carried by the green limb of the tree to the secondary wire, also in contact with the limb, and thence into deceased's residence and through the body of the deceased to the ground; that the resistance to electrical energy of the human body is less than that of a growing tree trunk; and that the passage of electrical energy through deceased's body would have been instantaneous and without causing the blowing of any of the fuses, lamps or meter in his residence. True, defendant's evidence was in sharp conflict with, and highly contradictory of, plaintiff's evidence and tended to show that deceased's death could have resulted from a normal current of 110 volts under the existing conditions; that, in the absence of actual contact between the primary and secondary wires (of which there was no showing), the higher voltage of the primary wire could not have passed into the Morrow home and through the body of deceased; that an excessive voltage would have been manifested by the blowing, or destruction, of the fuses, lamps and meter, not only in the Morrow home, but in every house upon the same secondary circuit; and that the delicately adjusted automatic instruments in defendant's substation, designed and intended to show such unusual electrical disturbance, showed no sign or record of any such occurrence. Such being the state of the record, it was for the jury to say which of the two theories, plaintiff's or defendant's, with the evidence in support of such theory, is true.

In Conner v. Railway Co., 181 Mo. 397, 411, we said: "If there is substantial evidence tending to show that an accident occurred in any one of two or more ways, or any other number of ways, while the burden rests upon the plaintiff to establish such cause of the accident as would render the defendant liable, it by no means presents a case of mere conjecture; but is a question of fact, which should be submitted and determined by the triers of the facts. We only enter the field of conjecture in the absence of proof; when proof enters, conjecture disappears."

In Myers v. City of Independence, 189 S. W. l. c. 820, it is said: "Electricity is, perhaps, the most insidious as well as the most destructive of the natural forces of which we are cognizant. What it is is a matter of pure speculation, for no one has ever seen it, but we have all seen victims of its deadly energy. Our knowledge of it is still so limited that we must rely on experts in electrical science

for information as to the conditions which mean life or death to those who come in contact with it. [Campbell v. United Railways, 243 Mo. 141-151.]''

In Vessels v. Light & Power Co., 219 S. W. 80, 87, we had occasion to say: ''The negligent act of defendant was complete when the fatal current was permitted to escape to the secondary wire entering the laundry. There was evidence that these wires, the primary and secondary, were knowingly permitted by defendant to rub against each other from the action of the wind during the period of at least ten months. That this tendency was increased by contact with the branches of a tree, which naturally wave in the wind; that the conditions both of moisture and metallic contact existed at the point where the fatal stroke was received, which were liable in the course of the movements of the deceased with the lamp in his hand to place his body in a ground circuit; together with the fact that his death did occur under circumstances which have suggested no other explanation—were all incidents within the charges of the petition, and amply authorized the submission of the cause upon the theory of negligence therein pleaded. It is, in short, the only kind of proof of which the issue is susceptible. The deadly agent is invisible, and its course can only be followed by its effect. We use it freely in our families for light and heat and mechanical energy. It lights our rooms, turns our fans, cooks our food, and serves many other useful purposes, and we depend and must depend for safety on those who sell and deliver it for our use. If they deliver it so carelessly that death or bodily injury is the result, the only evidence of the wrong is found in the condition of the appliances and the result produced. The deadly agent has come, done its work, and gone invisibly and silently, and its passage can only be shown by the effect it has produced.''

In a recent case in which the facts and the evidence are strikingly similar to the case at bar, Solomon v. Moberly Light & Power Co., 303 Mo. at page 639, this court, en Banc, in an opinion by RAILEY, C., said: ''Under another proposition appellant asserts that: 'It is not permissible to undertake the establishment of a fact by several presumptions; an inference cannot be based on an inference, nor a presumption on a presumption, to support a verdict; and since this case was thus established, the verdict cannot stand.' . . . It is manifest from the record that deceased was killed by the electricity which passed through the meter and from thence to the wire in the Ricker garage. It does not appear from the record that the garage wire was connected with any other current of electricity except that furnished by defendant. Hence, the jury had the right to find from the undisputed evidence, and not from a presumption, that deceased was either killed by a voltage of 110, which would not

have rendered the defendant liable, or he was killed by an electrical current whose voltage exceeded 110. The jury found, under proper instructions of the court, that deceased was not killed by a voltage of 110. The plaintiff produced substantial evidence tending to show that defendant's wires running through the trees in the 700 block were permitted to sag; that in places near the trees the insulation had worn off; that the green limbs of the trees when the wind was blowing were sufficient to cause the 2300 voltage wire to come in contact with the wire of 110 voltage, and communicate to the latter a part at least of the 2300 voltage in excess of 110; that the above conditions had existed for a sufficient length of time to impart notice to defendant; that sparks had been seen flowing from the wires in said trees for some time before the death of decedent. The foregoing facts presented to the jury a typical case of strong circumstantial evidence, upon which they were warranted in returning a verdict for plaintiff, based upon proper instructions.''

In a somewhat similar case, Augusta Railway & Electric Company v. Beagles, 12 Ga. App. 849, 78 S. E. 949, 950, the Georgia Court, in ruling the same point, used language almost identical with that used by us in the Solomon case, when they said: ''There were only two ways so far as the evidence discloses, by which the plaintiff could have been injured by the shock from the electric current. He received it by taking hold of a defective light socket inside the building through which no more than 110 volts of electricity were passing, and which was rendered dangerous because he was at that time standing on the damp earth or brick floor; or by reason of a contact of the primary wires with the secondary wires, which transmitted into the building the high voltage from the primary wires, he received this high voltage while turning on this light. There was evidence in support of both theories, and it was for the jury to say which theory was the truth.''

Another case strikingly similar in the facts is Welsch v. Light & Power Co., 193 N. W. 1. c. 429, wherein the Iowa Supreme Court said: ''Counsel say, and frequently emphasize by repetition, that there is no evidence whatever that deceased came in contact with any electrical appliance, or that such contact, if inferred from circumstances, could have exposed her to a fatal stroke; that the agency causing the marks or burns upon her hands is not proved, but is purely a matter of inference, and that to find her death was caused by any such inferential contact is a mere inference drawn from an inference and does not rise to the dignity of evidence. . . . But neither court nor jury is bound to accept as final and conclusive the defendant's showing of the perfection of their apparatus or of their scrupulous care and caution in its management, if the proved or admitted circumstances be such as will justify reasonable men in finding otherwise. True,

the mere fact of the death of the deceased carries with it no presumption or inference that it was caused by an electric shock or is attributable to the act or neglect of the defendants, but, if the attendant circumstances be such as to justify a fair-minded jury in tracing the death to such cause, the testimony of the defendants, no matter how positive or direct, does no more than to raise an issue of fact. . . . It appears without dispute that defendant's plant was the only source supplying electric light and power in that neighborhood; that they were receiving over their primary wires something like 2300 volts, a dangerous volume, transmitting it through the town, and by the aid of transformers and other devices distributing it to their customers. The secondary wires through which the current was delivered to the homes and shops having such service were strung on the same poles and within thirty inches of the main or primary wires carrying the current in death-dealing quantities. Humanly speaking, there appears to be no possible source of electricity upon the secondary or service wires except that with which the primary wires were loaded. If, then, the circumstances of this woman's death be such as to fairly indicate that it was caused by electricity, and no primary or direct evidence be procurable, then, to use the language of Mr. Curtis (on the Law of Electricity, p. 933), it is sufficient if the evidence be such as 'indicates with reasonable probability the truth' of the charge that it was so produced. That such a finding is justifiable is supported by all human probabilities and experience.''

Decisions of other and foreign jurisdictions, bottomed upon similar evidentiary facts, wherein it is ruled that the question of defendant's negligence is properly submissible to a jury, might be multiplied. We merely cite a few of such decisions: Denver Consolidated Electric Company v. Lawrence, 31 Colo. 301; Lynch v. Light & Power Co., 268 Pa. 337, 112 Atl. 58; Texas Power & Light Co. v. Bristow, 213 S. W. 702; Coleman v. Power Co., 189 Iowa, 1063, 178 N. W. 365; San Juan Light & Transit Co. v. Requena, 224 U. S. 89; Myers v. Light & Power Co., 68 Ore. 599, 138 Pac. 213; Turner v. Power Co., 154 N. C. 131; and Ohrstrom v. City of Tacoma, 57 Wash. 121, 106 Pac. 629.

Appellant insists that Kuhlman v. Water, Light & Transit Co., 271 S. W. 788, recently ruled by this division of this court, is determinative of the instant case. In that case we ruled that the alleged negligence of defendant was an issue for the jury, but reversed and remanded the case on the ground that the given instructions were broader than the pleadings and the evidence. The Kuhlman case is distinguishable from the case at bar in that there was no evidence in the Kuhlman record respecting the amount of voltage of electrical current carried by the primary wires and thence, through the secondary wires, into the Kuhlman home, nor did the record show what

voltage constitutes a high-tension electric current. In the instant case, proof was made that defendant's primary circuit carried a voltage of 2300 and that a voltage in excess of 500 is dangerous to human life.

Appellant furthermore urges that, where the injury could have occurred from a number of causes, for only one of which defendant is liable, then plaintiff must show with reasonable certainty that the cause for which defendant is liable produced the resulting injury, and, if the evidence leaves the question to conjecture, the plaintiff must fail in her action. As we have heretofore said, in effect, we think that plaintiff has shown with reasonable certainty that deceased's death resulted from contact with a secondary wire in the drop cord charged with electrical current in excessive quantities and of such high voltage as to be dangerous to anyone touching the drop cord, a cause for which defendant, by the great weight of authority in this and other jurisdictions, is liable in damages. The point is squarely ruled in Ohrstrom v. City of Tacoma, 57 Wash. l. c. 126, whereat it is said: "It was sufficient if, from all the circumstances there present and as testified to by the various witnesses, there was a preponderance of evidence to convince the jury that he did come in contact with the electric light, and in so doing received a shock which caused his death. This was not a case such as appears in many of the cases relied upon by appellant, where death might have occurred from several present causes, for some of which a defendant might be responsible and for others not, and it was held that the jury should not be permitted to speculate as to which one of these causes produced death. Here there was no other cause shown in the evidence which might have produced the condition existing. The mere fact that the physicians testified that persons may die from other causes or shocks producing some of the conditions here found was not sufficient to bring the case within the rule contended for by appellant, without some evidence of the existence or presence of some of these causes. Neither, in cases of this character, do the authorities demand proof of actual contact in order to fix liability for death or injury from an electric shock."

Nor can we assent to appellant's argument that plaintiff's theory of the case is opposed to the physical facts, merely because the persons who removed the limb of a tree in contact with both a primary wire and a secondary wire received no electrical shocks while engaged in the removal of the limb. The conditions under which they were working at the time of the removal of the limb were wholly different from those of deceased. Deceased was naked, standing with his bare feet upon a damp concrete floor, which the testimony indicates was highly favorable to the instantaneous passage of an electrical current through his body to the ground, whereas the per-

sons removing the limb of the tree were clothed and were not standing upon the ground, but were either resting upon the tree itself or some other wooden support.

The trial court properly submitted the case to the jury upon the issue of defendant's negligence and the assignment of error must be denied.

III. Error is assigned in the giving of certain of plaintiff's instructions. It is urged by appellant that plaintiff's Instruction 1

**Instructions.** is erroneous in that it assumes that the extension or drop cord inside of deceased's residence was part of appellant's distributing system, whereas the undisputed evidence is that the inside wiring of the Morrow home was not installed or maintained by defendant; hence, it is claimed that the instruction is not supported by the evidence and broadens the issues. The particular portion of the instruction complained of required the jury to believe from the evidence that "defendant was . . . engaged in the business of selling and furnishing the consumers in the city of Liberty, electricity for domestic and commercial uses, and maintained and operated a *distributing system* within said city, consisting of wires and poles and other equipment for the purpose of transmitting electric current to and into private residences in said city for lighting and cooking purposes, and that . . . defendant was furnishing electricity for such purposes to the home of Allen E. Morrow in said city, through its said *distributing system;* and if you further find that a part of the *lighting system* in the home of said Allen E. Morrow was a drop cord in the basement," etc. It is apparent that the italicized words "distributing system" were used in the instruction as referring to defendant's outside or city-wide equipment, whereas the italicized words "lighting system" were referable to the inside wiring of the Morrow home and, hence, were not likely to have left the impression that they were used synonymously, or in the same category, with the preceding words "distributing system." But even though the instruction may be deemed misleading or confusing to the jury when standing alone, the error, if any there be, was cured by defendant's given Instruction 7, which clearly and unequivocally told the jury "that defendant under the law is not responsible for any defect in the wiring within the house of the deceased, so if you believe and find from the evidence that any defect in the wiring in the house of the deceased, if any, caused or directly contributed to the death of the deceased, if so, then your verdict will be for the defendant."

It is urged that plaintiff's Instruction 1 is also erroneous because it submits both general and specific negligence. It is said that general negligence is submitted in that part of the instruction which

required the jury to find and believe "that the defendant, its agents and servants, had carelessly and negligently caused or permitted said drop cord to become, and at said time to be, charged with an electric current in such excessive quantities and of such high voltage in excess of the usual and ordinary voltage so as to be dangerous to the life of anyone," while specific negligence is submitted in that part of the instruction which required the jury to further find "that such electric current in such excessive quantities and of such high voltage, if any, was transmitted to such drop cord through its wires . . . by reason of an excessive voltage of electricity passing from its primary wires, or its city street lighting circuit, to its secondary or house-service wires in that vicinity through contact with a limb or limbs of a tree or trees on said lines." In the Kuhlman case, supra, we held that an allegation of the petition that defendant "negligently permitted and caused current in dangerous and deadly amount to pass over the wires and through the equipment into said home" was an allegation of specific, rather than general, negligence; and so we view the allegation of plaintiff's petition herein that "defendant and its servants and agents had carelessly and negligently caused or permitted said drop cord to become and be charged with electric current in such excessive quantities and of such high voltage as to be dangerous to anyone touching said drop cord." The instruction follows the allegation of the petition, and in so doing it submits specific, rather than general, negligence. The fact that electric current in excessive quantities and of high voltage was transmitted to the drop cord by reason of an excessive voltage passing from the primary or street lighting wires to the secondary wires through contact with the limb, or limbs, of a tree, or trees, is merely evidentiary· of the specific negligence alleged in the petition. The acts of negligence were submitted conjunctively by the instruction and the jury were required to find the existence of both before returning a verdict for plaintiff. It appears to us; therefore, that the instruction placed an additional burden upon plaintiff, and required the jury to find an act of negligence which the petition did not require them to find; hence, it is a matter of which defendant will not be heard to complain. [Krinard v. Westerman, 279 Mo. 680; McIntyre v. Railway Co., 227 S. W. 1052, and cases there cited.]

It is claimed that the instruction broadens the issue raised by the petition in that it submits the fact that the high voltage of the current was "in excess of the usual and ordinary voltage" when the petition does not allege the same. The petition does allege that defendant caused or permitted the drop cord to become charged with electric current in *excessive* quantities and, as we have herein said, the word "excessive" is defined by lexicographers as "greater than the usual amount or degree." It is also claimed that the instruction

submits that there was an excessive voltage or current on the drop cord at the time of deceased's death, whereas there is no proof that there was any other than the normal current on the drop cord at the time. What we have said in Paragraph II hereof disposes of this claim adversely to appellant. It is also contended that the instruction should not have submitted the fact of the contact between the street-lighting circuit and a secondary wire by means of a limb of a live tree, because there was no evidence to support such submission. Defendant's manager testified that both the street-lighting wire and a secondary wire on the circuit serving the Morrow home passed through the limbs of a live tree west of Rev. Cuthbertson's house and that he "knew that the same limbs of the same tree were touching both wires." The witness Cuthbertson testified that he saw sparks or a blaze in this same tree on the evening of deceased's death. There was ample evidence to support the submission of this fact. It is urged that the instruction ignores and excludes from the consideration of the jury the points raised by defendant's evidence. The trial court gave, at request of defendant, nine separate instructions embodying its theory of the law of the case applicable to the evidence. These instructions given for defendant fairly and fully covered every defense raised by the evidence of defendant. The instructions must be read as one whole or entire charge to the jury and, although plaintiff's instruction may omit mention of defenses urged by defendant, the error, if any, is always cured where such mere matters of defense are supplied by instructions given on behalf of defendant. [McIntyre v. Railway Co., 227 S. W. l. c. 1055, and cases cited.] Finally, it is urged that the instruction is a roving commission to the jury to find, by conjecture and speculation, a verdict against defendant, and is misleading. We do not find the instruction to be subject to the criticism leveled against it.

Appellant urges that plaintiff's Instruction 3 on the measure of damages is erroneous in that it submits the question of damage or compensation upon the life expectancy of deceased alone, and does not take into consideration or submit the expectancy, health, vocation and habits of the plaintiff wife. It appears from the evidence that the wife was the junior in age and, hence, her life expectancy was longer than that of deceased. Plaintiff's damages were properly predicated upon the shorter life expectancy of deceased. The jury had some visual evidence of the health of plaintiff, for she appeared before them as a witness at the trial. The instruction was proper under our rulings in McIntyre v. Railway Co., 227 S. W. l. c. 1054, 1055, and cases there cited, and Midway Bank & Trust Company v. Davis, 288 Mo. l. c. 585.

It is claimed that plaintiff's Instruction 4 is erroneous in that it declares that "the testimony given by the expert witnesses who

testified in this case is to be taken and considered by the jury like the evidence of other witnesses who testified in the case." Instructions identical in language with that herein criticised were approved by us in State v. Crane, 202 Mo. l. c. 84, and State v. Weagley, 286 Mo. l. c. 690. We find no reversible error in the giving of instructions.

IV. Error is assigned in the admission of certain evidence over defendant's objections thereto. It is urged that the trial court erred in admitting the testimony of several witnesses as to

**Evidence.** having received electrical shocks in using certain fixtures and appliances in their respective homes and in admitting testimony of the sparkling of wires in certain trees through which the wires serving the Morrow home passed. Such evidence was properly admissible. [Solomon v. Light & Power Co., 303 Mo. 622; Kelly v. City of Higginsville, 185 Mo. App. 55; Texas Power & Light Company v. Bristow, 213 S. W. 702; Lynch v. Light & Power Co., 268 Pa. 337, 112 Atl. 58; Ohrstrom v. City of Tacoma, 57 Wash. 121, 106 Pac. 629.]

It is claimed that incompetent and prejudicial evidence was erroneously admitted tending to show that defendant did not use a safety device, known as a ground wire, on the secondary circuit supplying deceased's home, and that such evidence is clearly outside the issue tendered by the petition, which charges an act of mis-feasance, but does not charge non-feasance or failure to provide a safety device. Defendant's manager was asked, "What method is employed by ordinary companies, using ordinary care in their work, to prevent 2300 volts getting onto the 110-volt current?", and he answered, "Some companies don't do anything. Some use fuses and some ground their wires." He was then asked the purpose of the ground wire, and replied: "One of the purposes is, it's to keep excessive current off the line, or to rupture current in case of an accident. The object in putting it on there is to cause a short circuit and isolate that particular transformer in case of trouble, or if it don't do that, to open the circuit back at the sub-station. Q. Isn't the purpose of it to conduct excessive current into the ground so it won't go into the houses? A. Yes, sir." The charge or allegation of the petition is that defendant negligently caused or permitted the drop cord in deceased's home to become and be charged with electric current in excessive quantities and of such high voltage as to be dangerous. We think that evidence of any act or omission of defendant, whether it be the failure to use a ground wire or otherwise, tending to show that an excessive current of high voltage was caused or permitted to enter the drop cord in deceased's home, was properly admissible under the allegation, or charge of negligence, pleaded.

Lastly, it is urged by appellant that error was committed in admitting in evidence, as an exhibit, the limb removed from the tree across the street from the Morrow residence. This limb was removed from the tree about the middle of December, 1921, almost four months after deceased's death. It has two distinct burns or abrasions upon it. Objections to the introduction of same in evidence were made by defendant upon the grounds that the evidence was too remote, speculative and conjectural, and there is no evidence when the burns or abrasions were made. Defendant's manager, Gordon, testified that, on the morning deceased's dead body was found, he looked at the tree across the street from the Morrow house in a casual way and "saw the primary wires and secondaries both touching a good many limbs." Defendant's lineman, Allen, testified that, on the same morning, he "noticed a number of burns" on a limb of the same tree. Defendant's manager testified further that no changes had been made in the relative positions of wires and trees between the date of the casualty and the trial; that the positions of the limbs of trees were practically the same, except the slight changes due to natural or normal growth. It was also shown that, when the limb was removed, one of the secondary wires, leading into the Morrow home, was found imbedded in the limb at the point of the lower burn or abrasion and that the upper burn or abrasion was within a quarter of an inch of one of the primary wires. One of plaintiff's witnesses testified that he got a ladder and climbed up and over the tree and that there were no other burns in or upon the tree, except the two burns upon the limb removed therefrom, in evidence as an exhibit. In view of the testimony referred to, we are of the opinion that no reversible error was committed in the admission of the limb as an exhibit. [State v. Goddard, 146 Mo. 177; State v. Buchler, 103 Mo. 203; Connor v. Railroad Co., 149 Mo. App. 675; 22 C. J. 769.]

Finding no reversible error in the record, it follows that the judgment below must be affirmed, and it is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Graves, J.,* absent.