Albert Downey, Respondent, v. City of Macon, Appellant.*

Kansas City Court of Appeals. April 2, 1928.

*Corpus Juris-Cyc References: Damages, 17CJ, section 408, p. 1091, n. 85; Electricity, 20CJ, section 59, p. 378, n. 88; section 68, p. 392, n. 92.

*R. Wilson Barrow* and *George N. Davis* for appellant.

*Waldo Edwards* and *Mathews & Jones* for respondent.

ARNOLD, J.—This is an action in damages for personal injuries alleged to have been received by an electric shock due to the negligence of defendant.

The facts of record are that defendant is a city of the third class and, as such, owns and operates a plant for the manufacture and distribution of electricity to consumers through the usual channels and by the use of the usual appliances and attachments for such purposes. At the time of the occurrence which furnishes a basis for this action plaintiff was a resident of that part of the defendant city which lies west of the Wabash railroad tracks which run north and south through said city and west of the main business section thereof.

On October 9, 1926, plaintiff, who was and for sometime had been a consumer of the electric product of said city, lived with his wife and small son with his wife's parents, Mr. and Mrs. Steve Hurst, in the home of the latter on the north side of Lakeview or Weed street and on the west side of Wentz street. This residence and a private garage on the premises were served with electricity from the electric lines owned and operated by defendant. It is in evidence that at that time there was no other manufacturer or distributor of electricity to the consumers than the City of Macon itself. It also appears that the wiring of the Hurst premises had been done by the plaintiff who had had some experience in such matters, but defendant claims the work was "extremely crude."

The primary wires of defendant carried 2200 to 2300 volts of electricity. Such a wire ran west on Lakeview or Weed street from which secondary wires carrying approximately 110 to 115 volts came into the Hurst residence through a meter situated on the back porch, on the east side thereof. Using wires from the meter plaintiff had constructed a line to the barn on the premises and erected a pole some fifteen feet high upon which to convey the same. These wires entering the barn had been scraped by plaintiff and two wires taped onto them which ran into the wooden garage, already mentioned, about seventy or eighty feet distant. Between this garage and the Hurst residence was a milk house into which two wires had been dropped down for a drop light therein. The said line was higher at the pole than where it entered the garage. The line entered the garage through a piece of rubber hose the size of a garden hose. It appears that originally the wires had been attached to a socket in the middle and near the front

end of the garage and were there fastened to one of the rafters three or four feet from where it entered the building. Afterwards an extension cord about fifteen feet in length was attached to these wires near the point of entrance to the garage. This cord had a brass socket on the end in which a small light bulb was placed for the purpose of furnishing light in working on the automobile, and was capable of being carried from place to place therein within the limits of the length of the said drop cord. It is claimed by defendant that the wire on a portion of this extension cord was "patched up" and was unfit for such use. The garage in question was rectangular in shape, longer north and south than east and west, and was of sufficient length to accommodate a Ford car, with room to work around it, and with a board bumper at the north end. The garage was built of ship-lap and without lining, and had a concrete footing along the ends and sides and a floor of dirt and cinders. There was a drain around the building on the outside for the purpose of keeping the garage dry during all seasons.

On October 9, 1926, at about eight o'clock in the morning, as shown by the evidence, plaintiff, wearing a pair of boots with rubber heels and soles of rubber or composition, was standing on the oak plank (which he claims was perfectly dry), near the rear or north end of the garage and while so standing, he took hold of the said drop cord and received a shock of electricity which knocked him down, rendered him unconscious and severely burned his hands, head and shoulders. His small son was with him at the time and gave the alarm. Plaintiff's father-in-law and mother-in-law, in attempting to extricate him from the wire, received shocks from the charged wire and plaintiff's release therefrom appears not to have been successfully accomplished until plaintiff's wife, by operating the switch at the house, shut off the current of electricity. Plaintiff was taken into the house where he was treated by a physician and did not regain consciousness for some time.

It is shown by the evidence that the primary wires of the defendant carried a voltage of 2200 to 2300; that through transformers this voltage was reduced ten to one so that the current as it left the transformers was 220 volts; and by "hooking up" one 220 volt wire with one neutral wire, the current which entered the Hurst house and other houses in the neighborhood was reduced to 110 to 115 volts. There were two of these transformers located a little less than a block from the Hurst house.

The petition charges negligence as follows:

"Plaintiff states that it was the duty of defendant at all times herein mentioned to furnish and deliver to the plaintiff's home a

normal current of electricity, which was used and is used for residential and domestic purposes, and the voltage of said current should have been approximately 110 volts, but the defendant, wholly disregarding its duty in that respect, carelessly and negligently furnished and caused to be furnished to the plaintiff, and negligently permitted dangerous, excessive, unusual and deadly current of electricity to traverse the wires running to and into said residence and garage of the plaintiff, and thereby carelessly and negligently caused the plaintiff to receive said severe electrical shock.

"Plaintiff further states that the negligence and carelessness of the defendant in permitting and causing such dangerous, excessive and unusual electrical current to traverse the wires running into the plaintiff's residence and garage was the proximate and direct cause of the electrical shock received by the plaintiff, and the injuries resulting directly and solely on that account."

Defendant filed a timely motion to make the petition more definite and certain, quoted therein from the petition the charge of negligence above set out and further quoted therefrom—"that at the time said plaintiff so took hold of said drop cord, the defendant and its servants and agents had carelessly and negligently caused and permitted said drop cord to become and be charged with electricity, electric current and electrical energy in such unusual, unsafe, dangerous and excessive quantities and of such high voltage as to be dangerous and deadly to anyone touching or coming into contact with such drop cord. . . ."

The motion charges that these averments are too vague, indefinite and uncertain to apprise defendant in what way, if any, plaintiff claims defendant had been negligent and only charges negligence in general; that the petition does not inform defendant whether it is charged with a negligent act or a negligent failure to perform a duty; because the doctrine of *res ipsa loquitur* does not apply under the facts set out in the petition. This motion was overruled. Defendant thereupon filed its demurrer to the petition, charging the petition wholly fails to state facts sufficient to constitute a cause of action. The demurrer was overruled and defendant filed its answer consisting of a general denial; specifically denying that at any time mentioned in the petition it has negligently caused or permitted an electric current of excess voltage to be carried over its wires and into the residence and garage mentioned in the petition; denied that the voltage carried into residence and other buildings and to customers, and especially that carried into the residence mentioned in the petition is harmless, but, on the contrary avers that the same is dangerous when used in defective and improperly insulated cords and appliances, and

that if plaintiff received any injury from an electric shock at the time and place mentioned in the petition, that the same was caused and contributed to by the defective and insufficient wiring, equipment, cords and appliances installed on the premises by plaintiff, and by his negligent use of such defective and insufficiently insulated equipment, cords, lamps, lamp sockets and other appliances, and by plaintiff's negligent and reckless use thereof.

Upon the issues thus made the cause was tried to a jury, resulting in a statutory verdict for plaintiff in the sum of $1000, ten of the jurors signing the same. Motions for a new trial and in arrest were overruled and defendant has appealed.

It is charged the court erred in overruling the demurrer offered at the close of plaintiff's case, because (a) there was no substantial evidence offered tending to show negligence on the part of defendant, and because (b) plaintiff's testimony established the fact that the injury was caused by contributory negligence of plaintiff. In support of these contentions defendant insists there is no evidence, either direct or indirect, circumstantial or otherwise, tending to establish negligence on the part of defendant and in support of this position, relies strongly on the case of Morrow v. Gas, etc., Co., 286 S. W. 106. While the cited case is not on all fours with this one, yet the facts are sufficiently similar to permit a satisfactory comparison. In the Morrow case the deceased was found dead in the basement of his home, having burns upon his right hand and wrist the only reasonable and natural explanation of which was that they had been caused by contact with the electric drop cord which had been burned in two and part of which was found beside the dead body. As in the case at bar there was proof that the cord had previously been handled in safety; that the usual and normal current and voltage delivered by defendant to the home of the deceased was approximately 110; that such voltage is not usually dangerous to a normal, healthy person; that deceased was in good health; that neighbors served by the same secondary wires had received shocks when handling electrical fixtures and appliances within their respective homes on the night of deceased's death, or immediately prior thereto. So far the facts of the two cases run almost parallel. But in the Morrow case there was proof that the primary wire through which the current was furnished had been in contact with the limbs of a tree through which the secondary wires passed. The court held that while there was no direct proof that an excess of voltage had been carried over the secondary wires into deceased's home, yet the proof was such that it was a question for the jury's determination. [Citing Conner v. Ry. Co., 181 Mo. 397, 81 S. W. 145; Myers v. City, 189 S. W. l. c. 820; Vessels v. Light & Power Co.,

219 S. W. (Mo.) 80, 87; Solomon v. Light & Power Co., 303 Mo. 622, 639, 262 S. W. 367, 372.] In the Solomon case the court said:

"It is manifest from the record that deceased was killed by the electricity which passed through the meter and from thence to the wire in the Ricker garage. It does not appear from the record that the garage wire was connected with any other current of electricity except that furnished by defendant. Hence, the jury had the right to find from the undisputed evidence, and not from a presumption, that deceased was either killed by a voltage of 110, which would not have rendered the defendant liable, or he was killed by an electrical current whose voltage exceeded 110. The jury found under proper instructions of the court that deceased was not killed by a voltage of 110. The plaintiff produced substantial evidence tending to show that defendant's wires running through the trees in the 700 block were permitted to sag; that in places near the trees the insulation had worn off; that the green limbs of the trees when the wind was blowing were sufficient to cause the 2300 voltage wire to come in contact with the wire of 110 voltage, and communicate to the latter a part at least of the 2300 voltage in excess of 110; that the above conditions had existed for a sufficient length of time to impart notice to defendant; that sparks had been seen flowing from the wires in said trees for some time before the death of decedent. The foregoing facts presented to the jury a typical case of strong circumstantial evidence; upon which they were warranted in returning a verdict for plaintiff, based upon proper instructions."

And so, in the light of the rulings in the cited cases, and especially in the Morrow case upon which both parties hereto seem to rely, we must hold there was no error in the action of the trial court in overruling defendant's demurrer at the close of plaintiff's case. This ruling also applies with similar force to the order overruling the demurrer at the close of all the evidence; because the testimony in defendant's behalf served only to oppose plaintiff's position in the matter; thus creating a conflict in the evidence for the determination of the jury. We think the words of the Supreme Court in the Morrow case, l. c. 114, peculiarly applicable to the situation here presented, wherein it is said:

"As we have heretofore said, in effect, we think that plaintiff had shown with reasonable certainty that the deceased's death resulted from contact with a secondary wire in the drop cord, charged with electrical current in excessive quantities and of such high voltage as to be dangerous to any one touching the drop cord, a cause for which defendant, by the great weight of authority in this and other jurisdictions, is liable in damages."

We need not here reproduce the evidence shown in the record on this point. It is not disputed that such evidence was introduced and was not refuted. We find plaintiff's evidence was sufficient to carry the case to the jury and that the demurrer was properly overruled. Moreover we find the rule of *res ipsa loquitur* to be applicable here, and this ruling applies to defendant's charge that the court erred in refusing to require plaintiff to make his petition more definite and certain. On examination we find the petition to be almost identical with that in the Morrow case and we hold the opinion in that case to be governing here. The petition stated a cause of action and the evidence in support thereof was sufficiently substantial to take the case to the jury.

It is charged plaintiff's instruction No. 1 was erroneous in that it was a commission to the jury to speculate and conjecture and to build presumption upon presumption. We find this charge to be untenable. Defendant argues the court therein submitted to the jury the question of whether or not defendant negligently caused or permitted an excessive current of electricity to enter into the wires in plaintiff's garage, and that this was error because there was a total failure of proof in this respect. On careful examination we find the instruction follows the allegations in the petition which we have held to be good and that it conforms to the proof offered on this point. It may be added there appears to have been no way for plaintiff to prove directly and positively the amount of voltage that passed through the wires, but under the evidence, every reasonable inference may be indulged in plaintiff's behalf in this respect, and the court did not err in giving the instruction.

Defendant insists that on the whole case the testimony shows the verdict was the result of ignorance, prejudice and passion. What we have already said disposes of this contention against defendant and we need not discuss it further. Under point 7 of defendant's points and authorities it is inferentially charged the verdict is excessive. The testimony of Dr. Raines, the attending physician, who was called and examined plaintiff immediately after the accident, was to the effect that he found plaintiff in a state of semi-consciousness and that he remained all day in such state; that he was suffering from electrical shock and stasis of blood contributed to by the shock; his fingers were cooked to the bone, back of the second joint, the flesh burned so that one could smell it, the tissues all burned out; there were burns on his head, shoulder, down his back and on his feet and ankles; a place on his head was burned to the bone and these injuries were permanent; the fingers were drawn and would remain permanently in such condition.

It is in evidence that plaintiff was a professional ball player and the doctor's testimony was to the effect that he would not be able to follow this pursuit; that the shock would have an effect on his whole system in over stimulation of the blood supply; the heart would be over stimulated; that plaintiff is "over nervous" and that these conditions would be permanent. In the face of this testimony, practically undisputed and which the jury was warwanted in believing, we are not at liberty to declare the verdict of $1000 excessive. Moreover the jury saw plaintiff and could judge of the physical effects of the injury, and the court failed to declare the verdict excessive.

We find no reversible error of record and hold the judgment should be affirmed. It is so ordered. *Bland, J.,* concurs; *Trimble, P. J.,* absent.