[No. 8470. Department One. January 26, 1910.]

CHRISTINE OHRSTROM *et al., Respondents,* v. THE CITY OF TACOMA, *Appellant.*[1]

ELECTRICITY—NEGLIGENCE—EVIDENCE—SUFFICIENCY. There is sufficient evidence of negligence on the part of a city in failing to ground secondary circuits connected with its high voltage primary circuits, and in failing to cut off the circuit after notice of danger, where it appears that the city had notice of a ground on the primary circuit which allowed the high voltage to flow into the secondary system, where it was very dangerous to human life, and failed to cut out the circuit as it might have done by turning a switch, that its electrical code declared the danger, stating that it could be obviated by grounding the secondary circuits, and that the National Board of Fire Underwriters had called the city's attention to the dangerous conditions, and recommended grounding the secondary circuits.

SAME—EVIDENCE OF DEATH. There is sufficient evidence to establish that plaintiff's decedent met his death by coming in contact with a city electric system, where it appears that he was employed by the company whose circuit was charged with a high voltage by reason of a ground, that deceased was the first to turn on the electric lights in the morning, and was in the habit of doing so at a place where dampness made a good conductor, that he started for such place according to his custom, when he was heard to shout and staggered, coming from the electric light and fell near the light and was picked up immediately and found to be dead, his left hand was burned, a physician gave the cause of his death as electric shock, and his body had the appearance produced by death from electric shock; the deceased being in good health, no other cause for death being shown, and others having received shocks the same morning on the same circuit.

SAME—EVIDENCE OF DEATH—ADMISSIBILITY. In an action for death caused by contact with an overcharged secondary electric circuit supplying several establishments, it is competent, on the question of the dangerous condition of the circuit and of the city's negligence, to show that another man in one of the other establishments on the same circuit was found dead from an electric shock, a few moments before; and the evidence cannot be excluded because of its tendency to prejudice the jury.

DEATH—EXCESSIVE DAMAGES. A verdict for the death of a husband and father, for $27,000, reduced by the trial court to $18,000,

[1]Reported in 106 Pac. 629.

is still excessive, and should be reduced to $12,000, where the deceased was thirty-nine years of age and earning a salary of seventy-five dollars a month in a grocery store.

Appeal from a judgment of the superior court for Pierce county, Shackleford, J., entered July 12, 1909, upon the verdict of a jury rendered in favor of the plaintiffs, for $18,000, in an action for wrongful death. Reversed, and a new trial ordered unless $6,000 is remitted.

*T. L. Stiles, F. R. Baker*, and *F. A. Latcham*, for appellant.

*Loveday, Kelley & McMillan*, for respondents.

MORRIS, J.—John Ohrstrom, husband and father of respondents, died in the Younglove Grocery Company's store, Tacoma, on February 1, 1909. Claiming such death resulted from contact with appellant's heavily charged electric light system, the action was brought, and resulted in a verdict for respondents, and appellant, alleging error, appeals.

The chief assignments of error upon which appellant relies are in the admission of testimony, in the instructions, and insufficiency of the evidence to justify the verdict. The last two assignments raise the same question, and will be treated together. The negligence charged in the complaint consisted in the neglect and failure of appellant to cut off or ground one of its secondary circuits after permitting the same to become negligently overcharged and dangerous to life. At the conclusion of the evidence, the appellant requested an instruction from the court to the effect that plaintiffs had failed to show any negligence on the part of the city, or to connect the city in any way with the death of John R. Ohrstrom, which instruction was refused. For a proper discussion of this instruction and the error suggesting the insufficiency of the evidence, it becomes necessary to refer to the established facts: (1) with reference to the negligence of the city, and (2) whether the evidence justifies a

finding that such negligence was the cause of John R. Ohr-strom's death.

The city of Tacoma receives its power for electric lights from outside the city. This power is distributed from a central station, by primary circuits carrying a current of 2,300 volts. One of these primary circuits is called the Lower Pacific Avenue circuit, and upon it, at intervals, secondary circuits are cut in, to which current is supplied through a transformer which reduces the current upon the secondary circuit to 220 volts. These secondary circuits are known as the "three wire" type, and consist of two live and one dead wire called the neutral, and whenever a live wire is brought into circuit with a neutral, the current is further reduced to 110 volts. One of these secondary circuits, cut in on the Lower Pacific Avenue primary circuit, supplies the Young-love Grocery Company and other consumers, among them the West Coast Wagon Company. At the central station there is an appliance called the ground detector, the purpose of which is to signal by means of a red light whenever there is a contact between the wires of the primary and secondary circuits with faulty insulation, or for other reason there is a ground. This is indicated by the burning of the light in a red lamp, the strength of the light or its continuance depending on the completeness of the ground; and whenever this is indicated, the operator may, by throwing switches, detect the particular circuit at fault. Whenever there is a ground upon one of these primary circuits, any conducting substance will carry a current of 2,300 volts, and if the secondary circuit be affected, there would be a current of 1,150 volts, rendering such wires and their connection excessively dangerous, as 500 volts is ordinarily fatal to human life.

On the morning of January 31, at about 8:30, the operator in charge at the central station detected a ground, which came and went intermittently until about 2 p. m. Not considering it dangerous, he did not pull the circuits to ascertain the location of the trouble, nor did he make any report. At

4 p. m. he was succeeded by another operator, who detected a permanent ground and, pulling the circuits, ascertained the trouble to be upon the Lower Pacific Avenue circuit, and this fact he reported to the city electrician who instructed other assistants to go out and locate the trouble. The first crew went to work about 4:30, and worked until dark, but could not detect the trouble. A second crew commenced between six and seven o'clock, and continued to work until ten o'clock, when being unsuccessful, they quit, and reported their inability to find the trouble, at the central station. Nothing further was done by the city. The operator in charge at the central station, although he knew the trouble was upon the Lower Pacific Avenue circuit, continued that circuit in full operation, and made no attempt to render the same harmless, which could easily have been done by pulling the circuit and cutting off the current. An ordinance of the city is in evidence adopting the National Electric Code for the government of electric appliances in the city of Tacoma, wherein it is advised that:

"If the primary and secondary coils of a transformer come into contact electrically, the high voltage primary current may flow to the secondary system. If this should happen, the life of any one handling any part of the second system would be endangered. . . . If, however, the secondary coil is grounded, a breakdown in the transformer cannot cause a dangerous difference of potential between the secondary system and the ground, and only with certain unusual combinations of contacts between primary and secondary wires outside of the transformers will this protection fail to prevent the voltage of the secondary system from being raised above its normal limit. In order to secure the full benefit of the ground connection, reliable primary fuses of proper carrying capacity must be provided. The middle of the secondary coil is the proper point to ground, as there is then only half the normal secondary voltage between either side and the ground, thus reducing the liability of a breakdown of insulation, and also materially lessening the danger of fire if a breakdown does occur."

It is also shown that, about five years ago, the representative of the National Board of Fire Underwriters called the attention of the city council of Tacoma to the dangerous condition of the overhead wiring, and recommended the grounding of secondary circuits. This evidence was sufficient to submit the question of the appellant's negligence to the jury, in failing to ground the secondary circuit, and in failing to render the same harmless by cutting off the current after it had knowledge of the danger.

We will next examine the testimony with reference to its sufficiency in showing that the deceased met his death by coming in contact with appellant's electric system. The deceased was in the employ of the Younglove Grocery Company, which, as we have seen, was supplied by this secondary system, wherein it was subsequently discovered the fault was. It was his habit, upon reaching the store in the morning, to go to the toilet, which was located at the rear of the store and underneath the sidewalk. The toilet was lighted by an electric light hanging in the doorway, and directly over an iron plate or threshold. The storeroom, just outside the toilet, was used for storing kegs of salt fish, and the satly solution from these kegs was upon the floor and this iron threshold, and gave to that part of the store a general salty dampness which it is said is a good electrical conductor. The deceased, says one of the witnesses, was always the first to turn on this electric light every morning.

On the morning of February 1, at about 7:30 o'clock, as was his custom, he started for the toilet. Another employee of the store who was about twenty-five feet to the rear of deceased, says that he heard him "give a shout, a yell like pain," and he "staggered and fell," and that when he staggered he was coming from the electric light and close to the light. The light was not on and it was dusk. He could not see his hands, but it was "just like he would take hold of the light and go away from it." The deceased was immediately picked up and placed upon some boxes, and was apparently dead.

One witness says the body had an odor like burnt leather; another detected an odor like something had been burning. Physicians were immediately called and found life extinct. One, Dr. Love, testifies the body was in a cyanosed condition; it was blue all over, and that he noticed a burn on the left hand; "I made only a slight examination. I could see he had been burned," and that he determined the cause of death as an electric shock. The other physician testified that he was called from the West Coast Wagon Company, two doors south, where only a few minutes before he had been called to attend a man who had been found dead, who had died from a shock and in such a condition as would be produced by an excessive electric shock; that he found a wound on the palm of Ohrstrom's hand that looked like a deep, wide cut; could not say whether it was a burn or cut, but that from its nature it could have been produced by an electric shock; that persons killed by electric shock are apt to show a wound or cut at the point of contact, but that death may result from such shock without any external evidence of a burn; that "in this particular case death being caused immediately, there was no attempt in the tissues to produce the usual reaction, which you would get with a burn in living flesh, inflammatory action set up; it is almost like the effect of a current upon a dead body is was so instantaneous." Another employee testified that, at about the same time, he went into the shipping office, having his rubbers on, and turned on an electric light, and that in doing so he felt a distinct shock, so much so that he gave expression to it and said: "Gee, that tickles." Other testimony shows that the deceased was in his usual good health and spirits when he reached the store that morning. This testimony was sufficient to submit to the jury the question whether the deceased received a shock while in the act of turning on the light.

In order to establish this fact it was not necessary to produce testimony of the actual contact between his hand and the light. It was sufficient if, from all the circumstances there

present and as testified to by the various witnesses, there was a preponderance of evidence to convince the jury that he did come in contact with the electric light, and in so doing received a shock which caused his death. This was not a case such as appears in many of the cases relied upon by appellant, where death might have occurred from several present causes, for some of which a defendant might be responsible and for others not, and it was held that the jury should not be permitted to speculate as to which one of these causes produced death. Here there was no other cause shown in the evidence which might have produced the condition existing. The mere fact that the physicians testified that persons may die from other causes or shocks producing some of the conditions here found was not sufficient to bring the case within the rule contended for by appellant, without some evidence of the existence or presence of some of these causes. Neither, in cases of this character, do the authorities demand proof of actual contact in order to fix liability for death or injury from an electric shock.

In *Clements v. Louisiana Elec. Light Co.*, 44 La. Ann. 692, 11 South. 51, 32 Am. St. 348, 16 L. R. A. 43, there was no eyewitness, and no one could be produced, who could tell how the accident happened. Yet the court says: "But we think from all the attendant circumstances that he was either stepping over the wire or going under it." So, in the case before us, the jury were, from all the attendant circumstances, justified in believing that the deceased received a shock while attempting to turn on the light.

In *Illingsworth v. Boston Elec. Light Co.*, 161 Mass. 583, 37 N. E. 778, 25 L. R. A. 552, there was evidence that the plaintiff's hands were burned by electricity, and it was held sufficient for the jury to find that the accident resulted from touching an uninsulated wire. In *Brown v. Edison Elec. Illuminating Co.*, 90 Md. 400, 45 Atl. 182, 78 Am. St. 442, 46 L. R. A. 745, a boy was sent up to clean a roof, and shortly afterwards was found there insensible in contact with an

electric wire.   No one witnessed the accident.   The boy tes-
tified that he was stooping over the edge of the roof to re-
move a ball from the gutter, and was resting on his left hand.
Suddenly his hand slipped, and he immediately became uncon-
scious.   Held, sufficient to show the injuries resulted from
contact with the wires.

In *Boyd v. Portland General Elec. Co.*, 37 Ore. 567, 62
Pac. 378, 52 L. R. A. 509, an eleven year old boy was found
lying on the ground immediately under a broken electric
wire, in an insensible condition and badly burned.   No one
witnessed it, and the boy was unable to give any account of
how it occurred.   There was a broken wire crossing over other
wires, and hanging down in two loops, one of which swung
near the ground.   The case was reversed for error in the in-
structions defining "reasonable care."   No question was raised
but that the evidence was sufficient to show the injuries re-
sulted from contact with the wire.   Other cases might be cited,
but the above are sufficient for our purpose.   We are, there-
fore, of the opinion that no error was committed in refusing
the instruction requested by the city, nor in refusing a new
trial upon the ground of insufficiency of the evidence.

Another point suggested by the appellant is error in the
admission of testimony of the finding of another dead man
two doors south, a few minutes before, under circumstances
indicating death resulted from electric shock.   We think such
testimony was admissible under the issues.   It had a tendency
to prove that the secondary circuit was in a condition dan-
gerous to human life (it being admitted both premises were
on the same secondary circuit).   This was a pertinent and
material fact to be shown by respondents in seeking to es-
tablish the negligence of the city, and for such a purpose it
was clearly competent.   Appellant says such evidence was
highly prejudicial and inflamed the minds of the jury.   If the
evidence was competent, we cannot go further and appreciate
its effect upon the minds of the jury.   Competency is not
to be determined by such a test or effect.   A like question was

passed upon in *Gilbert v. Duluth General Elec. Co.*, 93 Minn. 99, 100 N. W. 653, 106 Am. St. 430, where evidence of another person receiving a shock in the basement of the same house, and some hours after the accident there complained of, was held competent as tending to show the dangerous condition at the time of the prior accident.

The only remaining question is that the verdict was excessive. The verdict as returned was for $27,000. This was reduced by the trial judge to $18,000, and such reduction accepted by respondents. The appellant contends it is still excessive, and with this contention we agree. The deceased was thirty-nine years of age at the time of his death, and was earning a salary of $75 a month. In the case of *Walker v. McNeill*, 17 Wash. 582, 50 Pac. 518, cited and relied upon by appellant, the deceased was twenty-five years of age, a good business manager, and earning $150 a month. The court held that, under such circumstances, a verdict of $40,000 was excessive, and the same was reduced to $25,000. In *Sears v. Seattle Consol. St. R. Co.*, 6 Wash. 227, 33 Pac. 389, 1081, the deceased was thirty years of age, earning $50 a month in addition to performing other duties. A verdict of $15,000 was held not excessive. Upon the principle and reasoning of these cases, and having fully in mind the weight that should be given to verdicts in cases of this character, we think $18,000 is still excessive, and that there should be a further reduction to the sum of $12,000.

The cause is remanded, and the respondents may have thirty days after the remittitur is filed in the court below to consent in writing to a judgment in the sum of $12,000, which said judgment, upon such consent, the court below is hereby directed to enter. If such consent be not so filed and such reduction not accepted, the court below is instructed to order a new trial. Appellant will recover costs in this court.

Rudkin, C. J., Chadwick, Fullerton, and Gose, JJ., concur.