[No. 23494. Department One. April 5, 1932.]

ROBERT THOMPSON, *as Administrator, Respondent,* v. C. FIORITO *et al., Appellants.*[1]

[1]Reported in 9 P. (2d) 789; 12 P. (2d) 1119.

*Pearson & Potts,* for appellants.
*Zabel & Stoneman,* for respondent.

BEELER, J.—Edward Schieck was fatally injured in an automobile collision, the accident having occurred at the intersection of so-called east 145th street and First avenue northeast, at a point several miles north of the corporate limits of the city of Seattle. Schieck left surviving him two children, a daughter, Edna Schieck, eighteen years of age, and a son, Fred Schieck, fifteen years of age, to whom we shall hereafter refer as "Fred." The action was brought by the administrator for the recovery of damages sustained by the heirs in consequence of the death of their father. The cause was tried to the court and a jury, and resulted in a verdict in favor of the daughter for eleven thousand dollars and in favor of the son for fourteen thousand dollars. The defendants' motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, being overruled, judgment was entered upon the verdict, from which the defendants have appealed.

Appellants assign error upon the ruling of the trial court on their motion for nonsuit at the close of the respondent's testimony, and again at the close of the case, and in overruling their motion for judgment n. o. v., contending that the driver of the Chevrolet was guilty of contributory negligence as a matter of law.

The facts that the jury were warranted in finding may be briefly summarized: East 145th street is thirty-two feet wide and extends east and west and crosses First avenue northeast at right angles, the latter street

being twenty-eight feet in width. Both of these so-called streets are graveled roadways. Both streets or roadways, approaching and entering the intersection, have a descending grade of approximately five per cent. Neither street is an arterial highway.

At about one o'clock p. m., September 3, 1930, the decedent and his son, who was driving his father's Chevrolet sedan automobile at the time of the accident or collision, were proceeding east on east 145th street, while the appellants' truck was approaching from the south on First avenue northeast, both vehicles traveling down grade. As the Chevrolet arrived at a point about one hundred feet west of the intersection, Fred looked to the right, but observed no traffic at that time. He again looked to the right when he was seventy-five feet from the intersection, and saw the appellants' truck approaching from the south at a distance of from 250 to 260 feet from the intersection. He then looked to the left to determine whether any traffic was approaching from the north; seeing none, he again looked to the right, at which time his car was twenty feet from the intersection, and the truck, according to his estimate, was from 150 to 175 feet away.

Up to this point—that is, up to within twenty feet of the intersection, the Chevrolet was traveling at a rate of speed of from fifteen to twenty miles per hour, at which point Fred applied the brakes and reduced the speed of the car to twelve or fifteen miles per hour, and released the brakes just as he was entering the intersection. While the Chevrolet traversed *this distance of twenty feet,* Fred apparently had his car well under control, and kept his *"eye on the truck"* to see if he *"had ample time to cross."* He continued eastward across the intersection at this same rate of speed, and as he reached the center line of First avenue north-

east, he again glanced to the right, when he saw the truck bearing down on him, and, to avoid an accident, he "stepped on the gas," and swerved to the left, and while so doing, the truck struck the Chevrolet at a point back of its right front fender. The Chevrolet was about three-fourths of the distance across First avenue northeast when the impact occurred. The crash was terrific, the Chevrolet being wrecked and thrown up against a telegraph pole on the northeast corner of the street intersection.

The first question then is: Was Fred guilty of contributory negligence, as a matter of law, in attempting to cross the intersection as appellants' truck was approaching on his right?

The appellants' truck was loaded with sand and gravel, the combined weight of the truck and load being from 18,000 to 20,000 pounds. Therefore, under the statute, its maximum speed limit, at any place on the roadway, whether while going across or between intersections, was 25 miles per hour:

"It shall be unlawful to operate any motor truck having a gross weight, including load, exceeding eight thousand pounds, equipped with pneumatic or hollow center cushion tires over or along the highways of this state at a greater rate of speed than twenty-five miles per hour; . . . ." Laws of 1929, Ch. 180, p. 458, § 2.

Under the evidence, the trial court properly instructed the jury that the speed limit of appellants' truck was twenty-five miles per hour, while that of the Chevrolet was limited to fifteen miles per hour, the reason for the difference being that the Chevrolet driver's *view of the intersection* within the last one hundred feet of his approach thereto was obstructed, as that term is defined by statute. Rem. 1927 Sup., § 6362-3.

Now, whether Fred was guilty of contributory

negligence depends upon whether he acted as a reasonably prudent person, being in the disfavored position, in attempting to cross the intersection while the appellants' car was approaching from the south. He had a right to assume that the truck would not exceed the speed limit as fixed by law, namely, twenty-five miles per hour.

Placing the most favorable construction on the respondent's testimony, as we must in determining whether he was guilty of contributory negligence as a matter of law, we have this picture: When Fred was seventy-five feet from the intersection the appellants' truck was 250 or 260 feet away, and when he was within twenty feet thereof, the truck was 150 or 175 feet away. So, while the Chevrolet traveled a distance of fifty-five feet, the truck traveled a distance of from seventy-five to one hundred ten feet. Throughout this distance of fifty-five feet, the Chevrolet was traveling from fifteen to twenty miles per hour.

Now, placing the most favorable construction upon these facts or figures, and assuming that the Chevrolet was traveling at fifteen miles per hour, we have this situation: While the Chevrolet traversed this distance of fifty-five feet traveling at fifteen miles per hour, the truck, in traveling a distance of seventy-five feet, was moving at the rate of twenty and five-elevenths miles per hour. If the Chevrolet was traveling at a speed of twenty miles per hour while it traversed this distance of fifty-five feet, and if the truck during the same period of time traveled a distance of one hundred ten feet, then the speed of the truck was forty miles per hour.

We set forth these figures and make these observations merely as bearing on the question whether the driver of the Chevrolet was acting as an ordinarily prudent person in believing that he had ample time to

cross the intersection with safety. Fred's impression of the speed of the truck *during the interval while he traveled the distance of twenty feet immediately prior to entering the intersection* is best gathered from his testimony on cross-examination:

"A. I kept my eye on the truck—I looked longer at the truck here (indicating on map) than I did up there (indicating on map) to see if I had ample time to cross. . . . I thought the truck was going at the speed that any truck should be going at."

But the appellants lay much stress on that portion of Fred's testimony wherein he said, "I can not drive a car and look at a truck at the same time." A careful reading of the record indicates that the witness in so testifying was referring to the attention he was giving to the truck when he was seventy-five feet from the intersection.

From all of the testimony, the jury were clearly justified in concluding that the driver of the Chevrolet had the truck constantly under observation while traversing the distance of twenty feet just before entering the intersection. If the truck was 150 or 175 feet from the intersection at the time the Chevrolet was within twenty feet thereof, then the Chevrolet traveled a distance of but twenty feet plus three-fourths of the distance across First avenue northeast, a total of approximately forty or forty-one feet, while the truck traveled a distance of from 150 to 175 feet. In other words, the truck was traveling approximately four times as fast as the Chevrolet. Several disinterested witnesses, appearing on behalf of the respondent, testified that the truck was "coasting" down hill with the "clutch released," and that the truck was not making "much noise;" that the truck was constantly increasing its speed as it approached and entered the intersection.

Under all of the facts and circumstances, we cannot

say, as a matter of law, that the driver of the Chevrolet was guilty of contributory negligence. Whether the driver of the Chevrolet was justified in believing that he had a reasonable margin of safety in attempting to cross the intersection, was clearly a question of fact for the jury.

*Martin v. Westinghouse Electric & Mfg. Co.*, 162 Wash. 150, 297 Pac. 1098, and *Martin v. Hadenfeldt*, 157 Wash. 563, 289 Pac. 533, are controlling here. The facts in the former case in many respects are very similar to the facts here. There, the collision occurred within an intersection. The plaintiff was traveling east while the defendant was traveling north. There, as here, the plaintiff was the disfavored driver. There, the plaintiff slowed down to a speed of from twelve to fourteen miles an hour just before entering the intersection. There the plaintiff looked to the right and saw the defendant's car at a distance of 120 feet from the intersection, and continued across the intersection at the same rate of speed. Here, the appellant's truck was at a distance of from 150 to 175 feet. There, after the plaintiff had crossed the center of the intersection, his automobile was struck just about midway. Here, the car had crossed about three-fourths of the distance of the intersection. There, the question raised was whether the plaintiff was guilty of contributory negligence as a matter of law. Passing on the question we said:

"Whether Mr. Martin was guilty of contributory negligence depends upon whether he acted as a reasonably prudent man, being in the disfavored position, in attempting to cross the intersection while the other car was approaching on Hatch street. He had a right to assume that the approaching car would not exceed the speed limit fixed by law, and that, before entering the intersection, its speed would be reduced until it could cross the intersection at a speed not greater than that

which was lawful. While the Willys-Knight was traveling thirty or forty feet at a speed of twelve or fourteen miles per hour, the other car had to travel a distance of one hundred twenty feet.

"It cannot be held, as a matter of law, that there was not a reasonable margin of safety, nor that Mr. Martin failed to act as a reasonably prudent man in attempting to cross the intersection, because, if the other car had not been exceeding the speed limit in approaching the intersection, and in crossing the portion thereof which it traversed before the impact, the Willys-Knight would have had ample time to pass out of the intersection, and there would have been no collision. The question was one of fact for the jury.

"In *Martin v. Hadenfeldt,* 157 Wash. 563, 289 Pac. 533, the facts are very similar to those in this case. The appellants say that no case could be more closely in point than that case. It must be remembered that there it was held that the question of whether the plaintiff, the driver in the disfavored position, was guilty of contributory negligence, was a question of fact for the jury, and not a question of law for the court. Construing Rem. 1927 Sup., § 6362-41, subd. 14, which provides that drivers, when approaching public highway intersections, shall look out for and give right of way to vehicles on their right simultaneously approaching a given point within the intersection, it was said:

" 'This provision is only a part of the rules of the road, and the various other statutory elements must, so far as applicable, be read into it, and, by so doing, it seems to us that an instruction upon the subject should embody all of the following elements:

" '(1) All rights of way are relative, and the duty to avoid accidents or collisions at street intersections rests upon both drivers.

" '(2) The primary duty of avoiding such accidents rests upon the driver on the left, which duty he must perform with reasonable regard to the maintenance of a fair margin of safety at all times.

" '(3) If two cars collide within the intersection, then they were simultaneously approaching a given point within the intersection, within the meaning of the statutes, unless—

" '(4) The driver on the left assumes and meets the burden of producing evidence which will carry to the jury the question of fact as to whether or no the favored driver on the right so wrongfully, negligently or unlawfully operated his car as would deceive a reasonably prudent driver on the left and warrant him in going forward upon the assumption that he had the right to proceed.' "

We are of the opinion that the respondent assumed and met the burden of producing evidence tending to establish that the favored driver operated his car so negligently and unlawfully as to deceive the driver of the Chevrolet. This is not a case where one fails to observe an oncoming object, but rather a case where the driver of a vehicle is deceived by the speed of an approaching vehicle from the favored direction. It is clear from the evidence that the accident would not have occurred if the truck had not been grossly exceeding the speed limit. It is equally clear, and the jury was justified in so finding, that the Chevrolet driver could easily and readily have been deceived as to the speed at which the truck was traveling down hill approaching the intersection.

Several errors are assigned based upon the giving of certain instructions and the refusal to give certain others. The alleged errors raised by these assignments are sufficiently disposed of by what we have heretofore said. We have examined with care the instructions given and those refused. Suffice it to say that the instructions given fairly and correctly stated the law applicable to the issues raised by the evidence, and at the same time sufficiently included matters covered by the appellants' proposed instructions.

The appellants next contend that the verdict of the jury was grossly excessive. This contention must be sustained. The decedent was fifty-three years

of age at the time of his death, a millwright by occupation, earning from seven to ten dollars per day. However, he was not steadily employed, having been out of work for several months prior to his death. The older child, Edna, had arrived at the station of life where she was, at least, partially self-supporting. She had been employed in a department store for a period of some eleven months prior to the death of her father. Both the daughter and the son had received possibly more than the average educational advantages, Edna being a graduate of, and Fred a senior in, an accredited high school.

After a careful review of the authorities, we conclude that the verdict should be reduced from twenty-five thousand dollars to twelve thousand dollars. Thus reduced, the verdict will be in harmony with our prior decisions. *Walters v. Spokane International R. Co.,* 58 Wash. 293, 108 Pac. 593, 42 L. R. A. (N. S.) 917; *Ohrstrom v. Tacoma,* 57 Wash. 121, 106 Pac. 629; *Vowell v. Issaquah Coal Co.,* 31 Wash. 103, 71 Pac. 725.

The cause is remanded, with direction to grant the appellants' motion for a new trial unless the respondent, within ten days after the remittitur shall have been filed, accedes to a reduction of the judgment from twenty-five thousand dollars to twelve thousand dollars. If the judgment as reduced is acceptable to the respondent, then the twelve thousand dollars shall be distributed as follows: five thousand dollars to be paid to the daughter Edna Schieck, and seven thousand dollars to the son Fred Schieck. The appellant to recover its costs in this court.

TOLMAN, C. J., PARKER, and MITCHELL, JJ., concur.

HERMAN, J. (dissenting)—I dissent. The majority opinion, I think, fails to give the fair purport of Fred Schieck's testimony. It speaks of that testimony thus:

"A. I kept my eye on the truck—I looked longer at the truck here (indicating on map) than I did up there (indicating on map) to see if I had ample time to cross. . . . I thought the truck was going at the speed that any truck should be going at."

The statement of facts shows his testimony on this subject was as follows:

"A. I kept my eye on the truck—I looked longer at the truck here (indicating on map) than I did up there (indicating on map) to see if I had ample time to cross. Q. And you were going to cross ahead of the truck? A. I was. Q. Why did you slow down then from '7' to '12' (points referred to on the map) if you were going to cross ahead of the truck? A. When I was at '7', I was watching the truck. Q. Did you notice the speed? A. I didn't notice the speed. Q. You saw it was coming, however? A. Sure, it was coming. Q. Some of the witnesses testified that it was going fifty miles an hour. You heard them testify, didn't you? A. Yes, sir. Q. But you cannot tell what speed it was going at? A. I cannot tell what speed it was going at. Q. Why can't you tell what speed it was going at? A. Because there was an angle there that kept me from judging its speed. Q. Well, it was going across your line of vision, wasn't it? A. Not exactly, no. Q. Did you have any idea how fast it was going? A. No, sir; I thought the speed— Q. (Interrupting) You haven't any idea how fast it was going? Mr. Stoneman: Let him answer your previous question. You interrupted him. Finish your answer. The Witness: I thought the truck was going at the speed that any truck should be going at. Q. You were looking at it, weren't you? A. I glanced at it; I didn't hold my eyes on it all the time. Q. As a matter of fact, you didn't pay any attention to the speed of the truck, did you? A. I did look at the truck. Q. Well, you didn't look long enough to realize how fast it was going? A. I cannot drive a car and look at a truck at the same time."

The foregoing testimony convinces me that the boy, being the disfavored driver, after having seen the

truck when he was seventy-five feet from the intersection, proceeded on his course without due regard for the vehicle approaching from the right. When the collision occurred, the Chevrolet sedan had reached a point about three-fourths of the distance across First avenue northeast. That street is twenty-eight feet wide. In my opinion, the evidence conclusively shows that the collision would not have occurred except for the contributory negligence of Fred Schieck in failing to comply with Rem. 1927 Sup., § 6362-41, subd. 14, which provides:

"Drivers, when approaching public highway intersections, *shall look out for* and *give right of way to* vehicles on their right, simultaneously approaching a given point within the intersection, and whether such vehicles first enter and reach the intersection or not: Provided, this paragraph shall not apply to drivers on arterial highways." (Italics ours.)

The boy was his father's agent for the purpose of driving the car, and the negligence of the boy is imputable to the father, for whose death damages are sought.

## ON REHEARING.

[*En Banc.* July 8, 1932.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein, and the cause is remanded as therein directed.