## RIES v. CHEYENNE CAB & TRANSFER COMPANY

(No. 2050; May 25, 1938; 79 Pac. (2d) 468)

For the defendant and appellant, there was a brief and oral argument by *Walter Q. Phelan* and *Allen A. Pearson* of Cheyenne.

For the respondent, there was a brief and oral argument by *John C. Pickett* and *Carleton A. Lathrop* of Cheyenne.

RINER, Justice.

This cause arising in consequence of personal injuries, occasioned by a collision between two automobiles, was tried in the district court of Laramie County. A jury was called to determine the disputed questions of fact. Its verdict was returned in favor of the plaintiff, Grace L. Ries, against the defendant, Cheyenne Cab and Transfer Company, a corporation, a judgment was thereafter duly entered thereon by the court, and the unsuccessful litigant now has asked a review of the record made in the case by direct appeal. No questions arise upon the pleadings, the introduction of evidence, except in one instance to be hereinafter considered, or upon the instructions given for the guidance of the jury concerning the law applicable. The parties will be referred to as aligned in the trial court or by their respective names.

The facts material to be considered in this court are substantially as follows: On the morning of October 17, 1936, between 8:00 and 8:30 o'clock, the plaintiff, with her husband and their small son, proceeded in their automobile to a point a short distance east of the intersection of Twentieth Street and Carey Avenue, on the southerly side of Twentieth Street in the City of Cheyenne, Wyoming. The car was there stopped,

her husband, who had been driving, left the vehicle, plaintiff took the driver's seat, and, with the child in the rear seat of the car, drove easterly along the street last mentioned to its intersection with Capitol Avenue, the first street on the east and which extends in a northerly and southerly direction. She traveled this distance, a comparatively short one, with the machine partly in low gear and partly in intermediate, at the rate of ten or twelve miles an hour, slowed the car somewhat by the application of brakes as she approached said intersection and looked in both directions up and down Capitol Avenue for north and south bound cars. Seeing no car "near enough," as she testified, that would interfere with her passage across the street, there being none from a quarter to a half a block away, with the auto still in intermediate gear and still moving at the speed mentioned above, she proceeded across the street without difficulty until her car had passed the north and south center line of Capitol Avenue.

Meanwhile, one C. R. Harrell, a sergeant in the service of the United States Army, had engaged a cab owned by the defendant and operated by its employee, one Abe Free, to take him from the Union Pacific Railroad Station in the city aforesaid to Fort Warren, the army post adjoining the western boundary of the municipality. This cab started north along Capitol Avenue, with Harrell as the only passenger in it occupying the back seat thereof. Harrell stated as a witness for the plaintiff that the street seemed to be pretty clear at that time in the morning; that the cab started out and attained a speed of not under thirty-five or over forty-five miles per hour; that two blocks from the railroad station the cab driver had to "hit his brakes," coming down to about fifteen or twenty miles per hour, in order to allow another car in the intersecting street at that point to pass from the left in front

of him and proceed on up the avenue; that at this intersection the cab driver "was caught in the jam" and "he missed a collision;" that the cab then continued on up Capitol Avenue at its original rate of speed, and as it came up to the intersection of Twentieth Street and the Avenue mentioned the driver of the cab again "hit his brakes;" that this action either threw his car or he then turned to the right, the cab shot forward, and the collision with plaintiff's car took place; that this made Harrell look and he saw the other car to the left momentarily; that then his head was struck due to the force of the collision, and he became unconscious.

Skid marks made by automobile tires east of the north and south center line of Capitol Avenue and extending some two to five feet immediately back of the Ries car wheels as it stood after the accident, and, also tire skid marks extending some nine to fifteen feet along the pavement on Capitol Avenue west of the City lot on the southeasterly corner of the Twentieth Street intersection, aforesaid, commencing some distance south from said intersection, and being about forty feet from the Ries car where it had finally stopped, were found by the undersheriff and the deputy sheriff of Laramie County, Wyoming, and a police officer of the City of Cheyenne when all three of these officials came to the scene of the collision shortly after it occurred. All of these officers, as witnesses for the plaintiff, stated that the driver of the taxicab admitted to them at that time that the longer skid marks south of said intersection were made by his car. Several of these officers also testified that these skid marks made by the cab wheels disclosed that when the driver of the cab released his brakes the car "swung to the right and appeared to go around the head" of the Ries car.

Free, the driver of the cab, stated, as a witness for the defendant, that he was traveling about twelve or fourteen miles per hour at the time he was about to

enter the Twentieth Street intersection; that he had not driven faster than fifteen miles per hour all the way from the Union Pacific Railroad Station to Twentieth Street; that he did not apply his brakes or slide his wheels south of the Twentieth Street intersection; that he passed no cars at the Eighteenth Street intersection with Capitol Avenue, and that the testimony of Harrell was untrue, as was the testimony of the officers as to his admissions concerning the skid marks of his car; that his four wheel brakes were in good shape at the time; that he saw no car enter the intersection of Twentieth Street and Capitol Avenue from either the right or left; and that the Ries car was distant about six or eight feet probably when he first saw it move east across that intersection.

There was also testimony on the part of the plaintiff that she did not see the taxicab until it was "right beside" her; that just as soon as she "had a flash of something coming" she stepped on her brakes and that her car was "almost to a stop" at the time of the collision; and that the cab hit her car at an angle a glancing blow on the front right side. Subsequent examination disclosed that the Ries automobile received the impact of the collision on the righthand side. The front end of the steel frame, an extremely rigid one with cross member construction, was bent six inches to the left, the right front fender, right front wheel, right front tire, radiator and bumper were badly damaged, and the right lamp on the car was bent.

The force of the collision toppled the taxicab over on its right side. The parts on the left side of that car which required replacement were the left front ventilator glass, the left rear door glass, the left rocker panel (a little panel under the door), the left front fender, two hub caps and some bolts and nuts. Damage was also inflicted on both left doors, left fenders and

running board, and also upon its right side due to falling over on that side.

The city ordinances of the City of Cheyenne provide so far as material here:

"Vehicles shall not be driven at a greater speed than fifteen miles per hour in that part of the City between 15th and 19th Street and between Thomes Avenue and Warren Avenue; and shall not be driven at a greater speed than twenty miles per hour in other portions of the City. In passing street intersections, anywhere in the city, in the event any other vehicle is approaching said intersection or corner from the opposite direction or from either side, and is within 100 feet of said intersection, the rate of speed shall not exceed 15 miles per hour."

And, also:

"Of two or more vehicles approaching and being about to enter an intersection, the one approaching from the right shall have the right of way."

Other facts shown by the record will be mentioned hereafter as may be necessary in connection with our discussion of the points argued by the parties.

Plaintiff's petition charged that her injuries were caused by the defendant's negligence in that its employee drove the taxicab at an unlawful, dangerous, reckless and high rate of speed; that said employee did not have due and reasonable control of defendant's automobile and drove it into the car in which the plaintiff was riding. The defendant's answer embodied a general denial, followed by general allegations of negligence on the part of the plaintiff and alleged to be the sole cause of her injuries; the defense of contributory negligence was also pleaded by defendant. Plaintiff's reply, by denials, put in issue the affirmative matter set out in the answer.

It is urged that the judgment should be reversed

because the plaintiff was, as a matter of law, guilty of contributory negligence. The argument advanced to uphold this contention appears to be as follows: The collision occurred at approximately the center of the intersection of Twentieth Street with Capitol Avenue, each of these streets being concededly forty four feet wide from curb to curb; that, therefore, the collision took place twenty-two feet from the west curb line of Capitol Avenue and the south curb line of Twentieth Street; that Harrell testified that the taxicab was going from thirty-five to forty-five miles per hour; that at forty-five miles per hour it was traveling sixty-six feet per second; that Mrs. Ries stated that she was traveling ten to twelve miles per hour, at which speed she would be moving about fifteen feet per second; that if she looked to her right as she came to the westerly curb line of Capitol Avenue, as defendant claims her testimony was, it would then have taken her slightly over one second to have reached the point where the accident happened; that as the cab reached the point where the collision took place at the same time the plaintiff did, it must have been distant from the point of collision slightly over one second of traveling time when plaintiff claims she looked to her right; that accordingly when Mrs. Ries was at the westerly curb line of Capitol Avenue, the defendant's car was slightly over sixty-six feet from the point where the collision occurred, or something over forty-four feet south of the south curb line of Twentieth Street, when plaintiff entered the intersection; that inasmuch as Mrs. Ries testified she saw no car moving in the half block south on Capitol Avenue, she either did not look at all or if she did look and negligently did not see the defendant's cab, the accident was due to her own carelessness in driving blindly ahead from the unfavored direction without regard for her own safety or that of any one approaching on the other

street. Our attention is in this connection directed to cases which declare correctly, as we think, as in Callahan v. Amos D. Bridges Sons, 128 Me. 346, 147 Atl. 423:

"Care and vigilance on the part of vehicular travelors should always vary, according to the exigencies which require vigilance and attention. An automobile driver is bound to use his eyes, bound to see seasonably that which is open and apparent, and take knowledge of obvious dangers. When he knows, or reasonably ought to know, the danger, it is for him to govern himself suitably. Thoughtless inattention on the highway, as elsewhere in life, spells negligence."

But several of the premises upon which the argument outlined above is undertaken to be based are mistaken ones. The collision occurred, as the plaintiff testified and as the jury were authorized to find, not at the center point of the intersection of Twentieth Street and Capitol Avenue, but after her car had passed that point, or in other words, at least approximately sixteen feet distant easterly therefrom. The Ries car was admittedly about 194 inches overall and was struck a glancing blow, as plaintiff testified, on its front end by the cab. Again, considering the testimony of Mrs. Ries in its entirety, the record discloses that she was not positive just when she looked to her right —whether it was as she "got just to the corner" or before she got to the corner; that she would naturally have waited, she said, until she got almost to the corner and where she would get a clear view of Capitol Avenue. The jury might have inferred from this evidence that she looked when she was a car's length from the west curb line of Capitol Avenue, as Exhibit A shows that she would then have had a clear view of the Avenue south and she would have been "almost" to the southwesterly corner of the intersection of the streets. Under such circumstances her car would have

had to travel at least some fifty-four feet to the point of collision, occupying more than three and one-half seconds of time in doing so. At a speed of forty-five miles an hour for the cab or sixty-six feet per second, the cab would have been more than 231 feet distant from the collision point and more than 209 feet from the southerly curb line of Twentieth Street. In short, as the defendant concedes in its brief, that from street to alley in the location under consideration the distance is at least 130 feet, the cab would have been between the alley and somewhere near the center of or near the southern end of the block between Twentieth Street and Nineteenth Street on Capitol Avenue. This situation would harmonize with plaintiff's testimony above mentioned, that when she looked she saw no car in the half block immediately south of the Twentieth Street intersection. At just what point plaintiff looked to the right and whether that was done at a time when a reasonably prudent person, under existing circumstances, should have done so, were questions of fact to be determined by the jury under all the evidence before it in the case.

While the ordinance of the City of Cheyenne, quoted above, gives the right of way to vehicles "approaching and being about to enter an intersection" from the right, over those so approaching from the left, it clearly does not intend to confer the right regardless of the distance the approaching cars may be from the intersection; neither does the law require a driver, having looked at a proper time and having seen that no car was coming on the other street within such distance as reasonably to indicate danger of interferance or collision, to continue to observe toward the right only, as he moves forward. The ordinance in question does not contemplate that superior right may be invoked when the car moving from the favored direction is so far from the intersection at the time the

car from the left comes into it that, with both proceeding within the lawful limits of speed, the latter will reach the line of crossing before the former will reach the intersection. 3-4 Huddy's Cyclopedia of Automobile Law, Section 153, Page 273, and extended list of cases cited in the note.

The driver of the car not entitled to priority may correctly assume that the other will obey the ordinance as to speed and will not approach at an illegal or excessive speed, unless observation advises him to the contrary. Under the facts in this case, as the jury were authorized to find them, plaintiff might reasonably have presumed that any vehicle approaching the intersection from the south would not exceed the speed limits fixed by the city ordinance and that she would be able to cross the intersection before any car from that direction reached it. Under the claim of right of way the taxicab driver certainly had no right to maintain a speed that was in violation of the ordinance and collide with one who is observing the law. Salmon v. Wilson, 227 Ill. App. 286; McHugh v. Mason, 154 Wash. 572. 283 Pac. 184; Saad v. Langworthy, 153 Wash. 598, 280 Pac. 74; Thompson v. Fiorito, 167 Wash. 495, 9 Pac. (2d) 789; Carlson v. Meusberger, 200 Iowa 65, 204 N. W. 432; Shuck v. Keefe, 205 Iowa 365, 218 N. W. 31; Lein v. Morrell & Co., 207 Iowa 1271, 224 N. W. 576; Primrock v. Goldenberg, 161 Minn. 160, 200 N. W. 920; Lachance v. Myers, 98 Vt. 498, 129 Atl. 172; Burdette v. Henson, 96 W. Va. 31, 122 S. E. 356; Page v. Mazzei, 213 Calif. 644, 3 Pac. (2d) 11; Hosking v. Danforth, 1 Calif. A. (2d) 178, 36 Pac. (2d) 427; Kraning v. Bloxson, (Ind. A.), 5 N. E. (2d) 649; and Swainston v. Kennedy, 253 Mich. 518, 235 N. W. 240.

Again there was testimony given by the undersheriff and the deputy sheriff of Laramie County and by a police officer of the City of Cheyenne, as indicated

above, from which the jury could have found that the driver of the cab undoubtedly saw the Ries car when he was forty feet distant from it, that he applied his brakes, and then turned to the right in an endeavor to go in front of that car, but failed to accomplish his purpose. The driver of the cab admitted on cross-examination that if he had been traveling twelve or fourteen miles per hour, as he claimed he was at the time he approached the Twentieth Street intersection with Capitol Avenue and had slid his wheels, as the officers testified in substance that he told them he did, he would have stopped the cab within five to ten feet. It would seem the jury could readily have concluded from this evidence before it that the excessive speed of the taxicab was the proximate cause of the accident.

Contributory negligence becomes a question of law only when reasonably men can draw but the one inference which points unerringly to such negligence. Clark v. Wallman, 116 Calif. App. 278, 2 Pac. (2d) 562; Couchman v. Snelling, 111 Calif. App. 192, 295 Pac. 845. We do not think such a situation is presented by the evidence in the case at bar. The question of plaintiff's contributory negligence was duly considered by the jury under instructions relative to the law thereon satisfactory to both parties, and we can see no good reason for interfering with their conclusion adverse to defendant's contention on this matter.

It is also contended on behalf of the defendant that reversible error appears in the record because the trial court overruled the defendant's objection to a question propounded by plaintiff's counsel to the witness Harrell, requesting him to describe what happened at the Eighteenth Street intersection with Capitol Avenue as the taxicab drove through it. We have hereinbefore indicated his answer to the effect that the cab driver tried to pass another car there coming in from the left, was caught in the jam, had to hit his brakes and

missed a collision. The objection was put upon the ground that "anything that happened two blocks away from the accident was too remote." The answer was admitted by the court, evidently on the theory that it was some evidence of the speed of the car a brief time before the accident took place at Twentieth and Capitol Avenue. It was also corroborative of the witness' previous statement that the taxicab driver was driving "pretty fast," the street appearing "to be pretty clear at that time of the morning." We do not think the ruling was error.

While evidence of the speed of a motor vehicle remote from the time and place of an accident is not admissible, unless it is connected with other evidence showing a fairly constant speed was maintained up to where the accident occurred—and it would seem there is evidence of that character in this record when Harrell's testimony is viewed in its entirety—the question of remoteness depends largely upon the facts appearing in each case and rests to a great degree in the sound discretion of the trial court.

Where an automobile was struck by a taxicab and a suit for damages followed, testimony of plaintiff's witness, who did not see the collision, that the taxicab passed the witness two blocks back from the collision going at great speed, nearly running into him, was held to be admissible and not error in Taxicab v. Hamburger, 146 Md. 122, 125 Atl. 914. In that case the court said:

"We think the circumstance of reckless haste a few blocks away from the accident was relevant, in the case of a taxicab, where the accident followed within such a short time; there being other evidence of excessive speed at the time of the accident. Huddy on Automobiles, (6th Ed.) § 929; Berry on Automobiles, (3d Ed.) § 1003."

In Dimock v. Lussier, 86 N. H. 54, 163 Atl. 500, it was decided that:

"It was also within the discretion of the trial court to permit a witness to testify that Dimock was traveling at a high rate of speed when he passed an intersection eight or nine hundred feet south of the point of collision. Lyman v. Boston & M. Railroad, 66 N. H. 200, 20 A. 976, 11 L. R. A. 364; 15-16 Huddy, Automobile Law, (9th Ed.) p. 351."

So in Davies v. Barnes, 201 Ala. 120, 77 So. 612, it was asserted to have been error to have allowed the witness to testify over objection to the speed of an automobile a block and a half away from the crossing where the accident happened, but the court said:

"With respect to the distance at which previous speed is admissible for this purpose, there must indeed be some limit; but, as in all similar cases, this will depend upon the facts of each case, and must be left to the sound discretion of the trial court."

And in Wigginton's Adm'r. v. Rickert, 186 Ky. 650, 217 S. W. 933, it was ruled:

"It was likewise competent to permit the witnesses who saw the machine on its journey up Main street at Tenth and Seventh and near Sixth to relate the speed at which it was going; this evidence tending to show how fast it was being run at Sixth street, as the distance between Tenth and Sixth is only four squares, and only a few moments elapsed between the time when these witnesses saw it and the accident."

See also Waldman v. Sanders Motor Co., 214 Iowa 1139, 243 N. W. 555; Hines v. Sweeney, 28 Wyo. 57, 201 Pac. 165, 1018.

Within the principle announced by these authorities we can not say that there was an abuse of discretion on the part of the trial court in admitting the testimony of which complaint is made.

The defendant further argues that the verdict of the jury for the sum of $6,000 was due to passion and prejudice arising out of the fact that the plaintiff was a young and attractive woman and the defendant a corporation engaged in the business of operating taxicabs on the streets of the City of Cheyenne. But such an argument would apparently lead to the conclusion that verdicts are based largely upon the personalities of the litigating parties. We hardly believe this to be so. Our observation leads us to think that evidence unworthy of belief meets at the hands of the ordinary jury the same fate whether advanced by a soulless corporation, a child of tender years or a young and attractive woman. Defendant's position would seem also to lead logically to the proposition that in such a case as this it could never have a fair trial before any jury selected as the law now directs. If that be so— and we doubt it very much—the difficulty is for the lawmaking body to remedy, not the courts. As pointed out in Murphy v. Southern Pacific Co., 31 Nev. 120, 101 Pac. 322, the words "passion or prejudice" when applied to the action of a jury mean "anger, resentment, hate, absence of reflection, disregard of the rights of others, and kindred motives." We find nothing of the sort in the record before us.

It is asserted that the verdict is excessive and that the injuries suffered by the plaintiff were not permanent. We are unable to accede to these views. The evidence in the case is not conflicting as to plaintiff's injuries. The defendant introduced no evidence at all concerning her condition. She testified at the trial had about five and one-half months after the accident, in substance, in regard to the injurious effects she experienced as a result of the collision: That after the accident she was so shaken up, sore and stiff she could hardly move; that her arm, her right leg from knee almost to her waist and the tops of both feet were black

and blue, and her right ankle was all swollen; that these discolorations have since disappeared; that she was in bed off and on at first for a number of days; that her back hurt her, aching all the time; that later on, while she was trying to do her housework, she stooped over and attempted to pick up an object and then found she could not straighten up; that the family physician was called, and as she was in such severe pain she could not move, she was placed in bed and tape was applied to her body; that when that was taken off the flesh was torn, and she had to wear a tight girdle to brace her back, which gave some relief, but the pain was there all the time, and was extremely severe; that this excruciating pain has continued—however, sometimes it does not hurt so badly; that if she does much stooping or tries to do more work than usual, the pain becomes more severe; that she has not been able to do her housework as she did before the accident; that her family has to do things for her now, such as picking up objects from the floor and dressing her, that she formerly did alone; that she has had to employ a girl, who is now doing all of her work, plaintiff not being able to perform it; that on the recommendation of her local physician she went to Denver to see a reliable bone specialist, who made a thorough examination of plaintiff's body and then advised that she be fitted with a metal brace for her back; that she was wearing the brace at the time of the trial and it has eased up the pain a great deal; that she has been extremely nervous for a long time since the accident and unable to sleep at nights; that her hair has turned half white; that before the accident she always had the best of health; that after consulting with her doctor, who told her she might try it, she went to a dance in December, 1936, but had to go to bed for a week afterwards; that she has received constant care from her family physician up to the time of trial.

An X-ray specialist, on February 18, 1937, took four radio-graph pictures of plaintiff's body and testified that they showed that the joints that connect the large pelvic bones with the lower end of the spine were widened, but there was no appearance of bone disease, fractures or dislocations; that such a condition allows the spine to sink into the pelvic bones and disturbs their relationship.

Plaintiff's local attending physician confirmed in large measure plaintiff's testimony as given above, and further gave testimony that Mrs. Ries had difficulty in leaning over and picking up things and difficulty in dressing; that all of those times there was hardly a day when she would stay up all day; that she would lie down and then get up and do part of her work; that this continued and these intervals of attacks, when she would have this severe excruciating pain in her back, occurred everywhere from two weeks to three weeks, and usually became very severe when she attempted to do much moving around; that the type of injury she suffered, recurs, due to the slipping of these joints and relaxation of the ligaments; that they get along very well for a time, and the simplest motion, —leaning over and giving her body a twist to one side —that will slip more than it is supposed to, and, due to the surrounding tissues, it will produce excruciating pain; that sometimes he would see her during these times and sometimes he would not; that she got in the habit of taking care of herself and going to bed and then getting up again; that the frequency of these attacks was somewhat longer as she went along, but always some discomfort in her back during all of the time if she tried to stay up all day; that there has been some improvement, but that she still has these recurrent attacks, which are possibly as bad as the one she

had at first; that she now wears a brace which takes care of most of the aching produced by the involvement of the lower lumbar ligaments, and it also limits the movements of her spine so that she is less likely to get a recurrence of the sacro-iliac over-slipping; that lifting or any sudden stop, or stooping over might cause a recurrence; that she might stoop over a dozen times and it would not particularly bother her and the next time there would be an over-slip and it would over-ride again, and she would suffer pain from three to ten days; that plaintiff is a woman thirty-six years of age.

As to the permanency of the injury to the back, the doctor testified that he was not recommending an operation in the case, which would require transplanting of bone from the shin into the affected joint so that there is no motion there at all; it is made completely rigid; that he could not say whether or not the condition of Mrs. Ries was likely to be permanent, but he "would say most of these cases that start off and have as much trouble during the first six months, have periods of recurrence almost all of their lives, as it recurs frequently. It might recur with some simple thing, some little twist of the body, or might recur with heavy lifting, or it is likely to recur with some little twist or movement of that part of the spine or pelvis"; that whenever a recurrence does come excruciating pain immediately follows.

The jury saw this woman on the witness stand, and in the light of the evidence presented,—which we have not at all undertaken to give in complete detail,—as to her condition, concluded that she was entitled to the award made as stated above. This verdict received the approval of the trial judge, who, of course, also saw the plaintiff at the same time. A motion for a new trial, claiming among other things that the verdict

was excessive, was argued and denied by the court. We are not inclined, upon the record before us, to disturb the judgment entered upon that verdict, and it will accordingly be affirmed.

*Affirmed.*

BLUME, C. J., and KIMBALL, J., concur.